**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph ALLEN, Defendant-Appellant.**

**No. 78–1715.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1979.

Decided April 10, 1979.

Rehearing and Rehearing In Banc
Denied June 11, 1979.

Michael P. Seng, Chicago, Ill., for defendant-appellant.

Scott Turow, Asst. U. S. Atty., Chicago, Ill, for plaintiff-appellee.

Before PELL, Circuit Judge, MARKEY, Chief Judge,* and WOOD, Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

On March 29, 1977, the grand jury returned a two count indictment against the defendant Joseph Allen.[1] The first count charged him with conspiring in September 1976 to steal approximately 44,000 pounds of beef from an interstate shipment in violation of 18 U.S.C. § 371. The second count alleged that Allen embezzled goods and chattels of a value exceeding $100.00 from an interstate shipment in violation of 18 U.S.C. § 659. After a three day trial the jury returned a verdict of guilty on both counts.[2] The defendant questions the sufficiency of the evidence, the jury instructions, the indictment, and the propriety of the sentence. We affirm.

---

* The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation.

1. Allen's girlfriend, Irene Perkins, was named but not indicted as a co-conspirator. Joseph Taylor, an indicted co-conspirator, agreed to cooperate with the government, pleaded no contest to the conspiracy charge in the first count, which resulted in the dismissal of count two and the imposition of a sentence of two years probation.

2. On count one the defendant was sentenced to 18 months of incarceration and on count two to four years probation to run consecutive to the sentence on count one, subject to the special provision that he repay the Federal Defender Program or the Administrative Office of the United States Courts the cost of his defense.

## I. Sufficiency of the Evidence

The evidence, briefly, was as follows. Joseph Allen was a truck driver for Coldway Express Co., a common carrier of interstate products. Codefendant, Joseph Taylor, was a dock hand for Gridley-Maxon, a fruit and vegetable wholesaler located on the south side of Chicago. In September 1976 Allen and Taylor had a discussion in which Allen asked Taylor if he knew anyone who would be interested in a truckload of meat. Taylor said that he would check on the matter. The following week Taylor saw Anthony Marino, a restauranteur from Wisconsin who shopped at Gridley-Maxon for fresh vegetables, and asked him if he would be interested in buying a shipment of meat. Marino answered, "Yes." The following Saturday Taylor relayed the information to Allen, who said, "Good. When I get one, I'll let you know." Later that month, Allen informed Taylor that he "had a load of meat" and that Taylor should "get in touch" with Marino. The following day Allen and Taylor met and proceeded together to Irene Perkins' residence. With Perkins, Allen's girlfriend, present, a call was placed to Marino, who rejected the shipment explaining he needed only "boxed beef" and not the lamb offered along with beef. Coldway Express Co. records show that in September a shipment of beef and lamb was destined for Washington, D.C. driven by Allen. It was not long, however, before Allen could fill Marino's order. Coldway Express Co. records show that later on September 24, 1976, the carrier assigned Allen to drive a load of beef to the Washington, D.C. area. The wholesale value of the shipment was $61,404.37.

After the truck was loaded, Allen contacted Taylor. "He told me to come over," Taylor testified, "he had a straight load of beef." From Perkins' apartment, Allen and Taylor phoned Marino. After some negotiations between Allen and Marino, Marino agreed to pay Allen $20,000 in cash. They planned a delivery that night. After the call Allen instructed Taylor to drive his own car to Wisconsin to pick up the cash. Allen told Taylor to expect two black men to be driving the truck of beef followed by another car. Later Allen called Taylor and notified him that he would not be talking with him again but that "his wife would." Near midnight the truck arrived at Marino's restaurant. Taylor did not recognize the persons driving the truck or the following car. The truck was unloaded and the payoff of $20,000 was made. Taylor returned to Chicago with the cash. Taylor then received a phone call from a woman identifying herself as "Joe's wife," who instructed him to bring the money to a laundromat, located half a block from Perkins' apartment. Meeting Perkins there, Taylor retained $3,000 for himself and handed Perkins $17,000. Taylor subsequently had a phone conversation with Marino about the beef during which he handed the phone to the defendant who attempted to satisfy Marino that the meat was not stolen. Allen and Marino never met each other personally during this transaction. Telephone company records confirm the series of calls.

Taylor and Marino both testified for the government. Their credibility is attacked by the defendant on the basis that they both participated in the conspiracy. The jury resolved the credibility issue against the defendant and we see no reason to disturb it. *United States v. Holleman*, 575 F.2d 139 (7th Cir. 1978); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Substantial evidence supports the jury's verdict; it fully deserves to be sustained. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

## II. The Instructions

First the defendant complains about the instruction defining reasonable doubt for the jury as being confusing and misleading. The court instructed the jury:

A reasonable doubt is what the term implies: a doubt founded on reason. It does not mean a doubt that may be purely speculative. It means simply an honest doubt that is based on reason and appeals to reason.

The defendant instead tendered an instruction which explained:

A reasonable doubt is a doubt based on reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his affairs.

■ If the given instruction was confusing and misleading we likewise see little illumination in defendant's tendered instruction. The identical instruction as given has been previously found not to be error although its use was not encouraged. *United States v. Loman*, 551 F.2d 164 (7th Cir.), *cert. denied*, 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977). We have found no definitions of reasonable doubt which may reasonably help explain its meaning to the jury. Reasonable doubt may be better left to speak for itself. *United States v. Larson*, 581 F.2d 664 (7th Cir. 1978); *United States v. Lawson*, 507 F.2d 433 (7th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

■ Next defendant objects to the conspiracy instruction which was given in preference to the one tendered by him. He also objects that although the trial judge had indicated that he would caution the jury from time to time about the limitations on the use of alleged co-conspirators hearsay he failed to do so. On this latter aspect our holding in *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), decided after the trial of the present case, obviates the necessity for interruptions by the judge to caution the jury during the trial. It is now contemplated that the trial judge outside the presence of the jury will make the preliminary determination regarding the existence of the conspiracy and defendant's participation in it in accordance with Federal Rule of Evidence 104(a). The trial judge did not make a specific determination based on a preponderance of the evidence as *Santiago* has suggested. Defendant does not assist us in identifying the particular prejudicial co-conspirator hearsay to which he now objects. However, testimony of that nature played a very minor role in this case. The existence of the conspiracy and defendant's leading part in it were adequately evidenced by the defendant's own admissions: the solicitation of Taylor to find a buyer for a load of beef, the telephone negotiations with Marino, his dispatch of Taylor to Wisconsin to collect the money and his later phone call to convince Marino that the beef was not stolen. There were in addition the phone and shipping company records and other circumstantial evidence. The absence of a specific finding by the trial judge in accordance with *Santiago*, although an implied finding may be gleaned from the record, is harmless error in the narrow circumstances of this case. It is apparent in the record that the trial judge fully understood the requirement for independent evidence. We note also the total failure of the defendant to remind the court to give the desired cautionary instructions at the appropriate times.

■ The conspiracy instruction given at the close of the case omitted that part of the conspiracy instruction which was customary before *Santiago* to the effect that co-conspirator statements could not be considered against Allen until the jurors were convinced by independent proof that a conspiracy existed and that defendant had participated in it. Defendant has more faith in the jury being able to somehow abide by that abnormal command than we do, but in accordance with our views expressed in *Santiago* as applied to the particular circumstance of this case we find no necessity for the full former instruction and therefore no reversible error. Where the totality of the instructions as given and the overall trial procedures were fair, along with substantial evidence of guilt, reversal is not required because of a questionable portion of an instruction. *United States v. Shaffner*, 524 F.2d 1021 (7th Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976).

## III. The Indictment Content

■ Defendant complains that although the indictment alleged the existence of a conspiracy from "on or about" a certain time period that one alleged overt act which occurred two days later should have been stricken, but was not. The "on or about" language of the indictment sufficiently included the later overt act within its scope.

## IV. The Court's Comments at Sentencing

■ Allen contends that comments made by the district court judge at the sentencing hearing indicated an impermissible intent on the part of the judge to penalize the defendant for the assertion of his Fifth and Sixth Amendment rights.[3]

■ The defendant has some basis for questioning portions of the judge's remarks as reflecting adversely upon the defendant's exercise of his Fifth and Sixth Amendment privileges. However, we believe a fair overall consideration of the remarks clearly discounts any such improper sentencing motive on the part of the judge. *United States v. Lehman,* 468 F.2d 93 (7th Cir.), *cert. denied,* 409 U.S. 967 (1972); *United States v. Chaidez-Castro,* 430 F.2d 766 (7th Cir. 1970). The trial judge made it clear that for sentencing purposes he was considering only the character of the defendant and the circumstances of the crime as he properly could do. The sentence was well below the statutory maximum, was not harsh, and was not a penalty for going to trial. Thus the defendant's reliance on *Scott v. United States,* 136 U.S.App.D.C. 377, 419 F.2d 264 (1966), is misplaced. The recent case of *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) makes it plain that the judge in sentencing may consider "the defendant's whole person or personality." "The trial court is given a broad discretion in considering the sentence to be imposed upon a convicted defendant. *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949). The exercise of this broad discretion will not be disturbed on review unless there is a plain showing of abuse by the trial court. *United States v. Cardi,* 519 F.2d 309 (7th Cir. 1975); *United States v. Willard,* 445 F.2d 814 (7th Cir. 1971)." *United States v. Santiago,* 582 F.2d 1128, 1137 (7th Cir. 1978). We find no abuse in the sentencing process warranting our intervention.[4] *United States v. Richardson,* 582 F.2d 968, 969 (5th Cir. 1978).

---

3. The trial judge commented in part:

I don't know what the defense was in this case. I don't know why the defendant went to trial. It is obvious that he could not truthfully have denied his involvement, or he would have taken the stand and denied it. He has no felony convictions with which he could have been impeached.

I am not suggesting that his failure to take the stand prejudiced him in the eyes of the jury. I assume that it did not. They were so instructed that it should not. I merely point that out to indicate that this is a man who was obviously guilty, as the jury found him to be and neither during the trial nor since the trial has he attempted to convince either the jury or this Court that he is not guilty of precisely of what the witnesses said he was guilty of.

There is absolutely no indication of any remorse, in the sense of having made a mistake, because, of course, there is no admission or concession of any kind.

That is a privilege that the defendant has. I don't say that he should be sorry for what he has done. That is his business, but it is also my business to take into consideration the nature of the person I am dealing with and the nature of his attitude toward what he has done when I impose sentence.

So I have standing before me someone who has committed a crime. He has no defense. There is no excuse for it, no mitigating circumstances whatsoever, and no indication that he has learned anything from the experience. There is the matter of some $17,000 having been earned, if you will, by this defendant in this crime, which has never been accounted for.

There is no doubt in my mind that he got the $17,000. He planned this crime, carried it out rather cleverly, with a great deal of forethought, great deal of planning, enlisted about five or six other people to help him, not only the co-defendant who testified but a girl friend, apparently three men who took care of driving the truck up to Wisconsin. He established contact with a fence who bought the meat, on the whole a rather sophisticated criminal operation.

4. We are cognizant that many of the circuits have charted their own courses concerning the sentencing boundaries in which the trial court may traverse when considering a defendant's failure to "repent" and "sing." For a discus-

## V. Defense Costs

After the defendant was indicted, he filed a financial affidavit with the court in support of his request as an indigent for court-appointed counsel. Allen certified, *inter alia*, that he owned a home and a Cadillac and was employed at McLean Trucking Co.,[5] that he began employment with McLean on March 26, 1977, and that he did not know his income but that he "may gross $1,000 per month." Subsequently the court appointed the Federal Defender Program to represent the defendant. At the sentencing hearing, however, Allen admitted that he had been earning substantially in excess of what he had previously claimed. It was in this light that the court, unsympathetic with an "indigent" earning over $25,000 a year, terminated the defendant's free legal services and thereafter ordered him to repay to the government the full cost of his defense during his four years of probation.

■ Unhappy with the repayment order, the defendant has launched a barrage of objections asserting that the condition is unauthorized by statute, violates the equal protection and due process guarantees of the Constitution, and chills the exercise of the right to counsel. We find that the order of the district court conforms with the dictates of the Criminal Justice Act, 18 U.S.C. § 3006A(f).[6] Judge Grady had the benefit of Allen's earlier misleading financial affidavit, was fully apprised of the defendant's family situation before sentence was passed, and knew that his income had been substantial and greater than previously revealed. Furthermore, the judge specifically found that there was "no doubt" that Allen still possessed the fruits of the crime, the missing $17,000 from the sale of the beef. The record amply demonstrates that after proper inquiries the judge was convinced that this defendant could afford to pay the price of legal services which he had improperly obtained at taxpayers' expense. We find no merit to the claims of the defendant. He owes the money and should repay it.

Affirmed.

---

sion, *see United States v. Miller*, 589 F.2d 1117, 1137–1139 (1st Cir. 1978).

5. The defendant also certified that he was married, had one dependent and "sometimes" assisted his 14-year-old son with an unstated amount of support. He wrote that he was separated from his wife, was living with his "common law wife," Irene Perkins, who earned $65.00 per week, and contributed to the support of Perkins and her 10-year-old daughter. Allen stated that he owned $4,000 equity in his home and that his only debts were the mortgage on the house and his car payments for the Cadillac. According to the affidavit, however, the defendant's lawful wife, not Allen, was making the mortgage payments.

6. In relevant part, Section 3006A(f) provides:
Whenever the United States magistrate or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender organization which provided the appointed attorney, to any person or organization authorized pursuant to subsection (e) to render investigative, expert, or other services, or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section.
The district court's authority to order reimbursement also finds support in 18 U.S.C. § 3651, which provides that a court may place a defendant on probation on "such terms and conditions as the court deems best."