**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Rodolfo MEDINA–HERRERA,
Defendant-Appellant.**

No. 78–2245.

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1979.

Decided Oct. 1, 1979.

Rehearing and Rehearing En Banc
Denied Oct. 26, 1979.

Allan A. Ackerman, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U. S. Atty., Scot Turow, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, SPRECHER and WOOD, Circuit Judges.

PELL, Circuit Judge.

The defendant, Rodolfo Medina-Herrera, appeals from his conviction for conspiring to distribute heroin in violation of 21 U.S.C. § 846. On appeal the defendant raises issues on evidentiary rulings. He also argues that his retrial after a finding of prosecutorial error violated the double jeopardy clause. He finally argues that his attorney had a conflict of interest, depriving him of due process and his right to effective assistance of counsel.

The evidence at trial showed that the defendant conspired with Candelario Alcantar, Jose and Jorge Vasquez, and Jose Lopez to distribute over twelve pounds of heroin to Richard Sanchez, an agent of the Drug Enforcement Administration (DEA), and Angelo Rodriguez, a Government informant. On September 8, 1977, Rodriguez and Sanchez, carrying $13,000 in a yellow Montgomery Ward bag, met Jose and Jorge Vasquez at a tavern where a sale of heroin was arranged. Alcantar, Vasquez and the informant Rodriguez drove to 2832 S. Trumbull in Chicago, the residence of the conspirator Lopez, where Alcantar removed a brown bag of heroin from the trunk of a white Ford. They returned to the tavern, and the sale was completed. Alcantar left the bar with the Montgomery Ward bag after giving some of the money to Jose Vasquez. Alcantar drove to 2831 S. Ho-

man, the defendant's residence, where the defendant was waiting in the front yard. Alcantar handed the Montgomery Ward bag to the defendant, and they both walked inside the house.

On September 22, 1977, two drug sales took place in a similar fashion. At 10:15 a. m. on that date, Government agents observed the defendant leaving the Lopez residence on Trumbull. He put a small brown paper bag in the trunk of his car and drove away. About 12:20 p. m., Lopez went to the defendant's residence on Homan. Alcantar was seen there a few minutes later. At 1:40 p. m., the defendant and Lopez came out of the defendant's house. Alcantar and Lopez returned to the Lopez house on Trumbull.

In the meantime agent Sanchez and the informant Rodriguez negotiated another purchase. At 11:45 a. m., Sanchez and Rodriguez went to the same tavern to which they had gone for the September 8 sale. Rodriguez met with Jose Vasquez. At 12:30 p. m., Rodriguez and Sanchez went to a parking lot across from the tavern. Jose and Jorge Vasquez soon arrived. Jose made a call from a pay phone, and then explained that his source of supply required the money in advance. Sanchez rejected these terms, and Jose promised to return later. They met again in the same parking lot at about 1:15 p. m. Jose made another call from the pay phone. He then handed Sanchez and Rodriguez a small sample of heroin. Sanchez then showed Jose the $26,-000 they were carrying in a red, white, and black bag.

The agent and the informant followed Jose and Jorge in their car to the corner of 30th and Homan. After they arrived, Jorge Vasquez headed up 30th Street and then north on Trumbull where he met and talked with Alcantar and Lopez. Alcantar and Vasquez then walked back to 30th and Trumbull, where Rodriguez and Sanchez were waiting. Alcantar negotiated briefly with Sanchez, then walked back to see Lopez on Trumbull. The two returned to Lopez' house. Alcantar then emerged from Lopez' house, carrying a brown paper bag.

Alcantar and Lopez got into a white Ford and drove toward 30th and Trumbull where the agent and informant were still waiting. Sanchez and Rodriguez were instructed to follow Alcantar in their car to the corner of 28th and Homan. They stopped about 100 feet south of the intersection. There, Alcantar delivered about a kilogram of heroin, and Jose Vasquez received the $26,000 in the red, white, and black bag. Sanchez and Rodriguez then left. It was approximately 2:00 p. m.

At 3:30 p. m. Rodriguez placed a call to the same tavern and started the second sale of September 22. The agent and the informant left the DEA office with $117,000. At 3:45 p. m., the defendant left his house by car, and arrived shortly after at the Lopez house. At the same time, Alcantar arrived on foot. Both Alcantar and the defendant entered the Lopez residence. At 4:00 the defendant left and returned home. About the same time, Sanchez and Rodriguez arrived near the corner of 28th and Homan and parked their car. A few minutes later, both Jose and Jorge Vasquez were seen at the Lopez residence. Alcantar met Jose and the two went inside. Jorge drove to where the agent and the informant were parked, spoke to them, and returned to Lopez' house. He spoke briefly to Jose and then drove back to tell the agent and informant to get their money ready. At 4:25 Jorge returned to the Lopez residence and Jose emerged carrying a white plastic bag. He gave the bag to Jorge. Jorge then returned to 28th and Homan and passed about four kilograms of heroin through the car window to Sanchez and Rodriguez. Jorge was immediately arrested. A Government agent simultaneously entered the Lopez residence and arrested Jose Vasquez, Lopez, and Alcantar. The defendant was arrested at his residence. The second floor windows there had a view of the street and were open.

Medina, Lopez, Alcantar, and the Vasquez brothers were charged in the same indictment. One count charged all of them with conspiracy to deliver heroin in September 1977. The defendant was also charged

in three separate counts with the substantive offense of delivering heroin. The defendant was tried alone on these four charges in February 1978. At this trial, the judge granted the defendant's motion to acquit on the three substantive counts, but sent the conspiracy charge to the jury. The defendant was found guilty on this charge. The trial court, however, granted a new trial on the defendant's motion because of prosecutorial error during final arguments.

The defendant was retried in July before the same judge on the conspiracy charge only. The jury returned a guilty verdict.

■ We turn first to the defendant's arguments relating to the proof of his involvement in the conspiracy. The defendant urges first that the trial judge erred in not making an express finding, preliminary to admitting co-conspirator hearsay, that the conspiracy and the defendant's membership in the conspiracy was proved by a preponderance of the evidence. This requirement was established by our decision in *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). It is well-settled, however, that in a trial that occurred, like this one, prior to our *Santiago* decision, failure to adhere to *Santiago* procedures is not reversible error. *E. g., United States v. Dalzotto*,

603 F.2d 642, at 644 n. 1 (7th Cir. 1979); *United States v. Allen*, 596 F.2d 227, 230 (7th Cir. 1979); *United States v. McPartlin*, 595 F.2d 1321, 1357 (7th Cir. 1979). It is sufficient here that the trial judge, who was already familiar with the Government's evidence, having presided over the defendant's previous trial, expressed his awareness of the need for a preliminary showing of the defendant's involvement and his intention to exclude the evidence if the Government failed to satisfy its burden.[1] *See United States v. Allen, supra*, 596 F.2d at 230; *United States v. McPartlin, supra*, 595 F.2d at 1358.

The defendant's next objection concerns the survival of the so-called "slight evidence" rule after the *Santiago* decision. At trial, the Government sought admission into evidence of videotapes of the defendant's actions on September 22, 1977, by investigating agents. The trial court admitted the videotapes. The defendant apparently argues on appeal that the *Santiago* preponderance standard precludes admission of the videotapes when the other evidence is only "slight."[2]

■ Although we have difficulty seeing any inconsistency between *Santiago* and the "slight evidence" rule,[3] we do not follow

1. The court told the jury when admitting the testimony:

    Before you answer that question I would like to instruct the ladies and gentlemen of the jury that I am going to allow this testimony at this point—I am making certain—an objection has been made to this testimony. I overruled the objection subject to the government tying up these conversations with the defendant. At this time there is no evidence of that, and unless the government does tie it up we will strike the evidence and I would so instruct you. But I am going to allow the evidence for that purpose at this time, with the understanding that the government will tie it up later. If they do not I will then strike the evidence in that event.

2. We have had some difficulty understanding the defendant's argument as to the tapes from his brief before this court. We have therefore turned to the trial transcript where trial counsel objected to admission of the tapes, apparently on the same grounds:

    [Defense]: Well, Judge, if you are going to deny my motion then I would request,

since—as I say, I can't say any more positively—I don't think there is any evidence whatsoever showing a conspiracy.

But would you then instruct the jury once again that until they firmly believe that the Government shows by good evidence his involvement in the conspiracy, that they can't take this stuff into their consideration?

\* \* \* \* \* \*

[Prosecution]: That only goes to—it doesn't go to his actions. . . . I have no problem with you instructing the jury about that when they go out but at this point right now we are not talking about any conversations, so I don't think an instruction about this conversation at this time is relevant.

3. The slight evidence rule is no more a substitute for the preponderance standard used for admission of co-conspirator hearsay than it is for the reasonable doubt standard used for the ultimate determination of guilt. It merely describes the type of evidence that may suffice to prove involvement in a conspiracy under these standards:

at all the defendant's argument that *Santiago* is applicable to the admission of the videotapes. Quite simply, the videotapes do not involve co-conspirator hearsay. To the contrary, they are a record of the defendant's *own conduct* tying him to the conspiracy. The proper foundation for the admission of these tapes was made through the testimony of the agents who witnessed the defendant's actions and made the tapes.

We add that the defendant has alluded to no specific co-conspirator hearsay admitted at trial as having been prejudicial. In fact, the most harmful evidence against the defendant in this case has been the close coordination between his own actions and those of his co-conspirators, and not anything his co-conspirators said about him.

We also find no merit in Medina's argument that his second trial was held in violation of the double jeopardy clause of the Fifth Amendment. Prior to the commencement of the first trial, the defendant moved to strike the Herrera name from the indictment and the pleadings. This motion was unsuccessful. After one venireman testified at voir dire that he thought he had seen the defendant's name in the paper, however, the court, with the consent of counsel, told the jury panel that the defendant's name had not appeared in the papers and that his name should not influence their determination of the case, because it is a common name in Spanish-speaking countries.[4]

During the trial, Angelo Rodriguez, the government informant, testified that the Vasquezes had replied in the affirmative to

> Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is a part of it. It is therefore possible for the circumstances of an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may be only slight.
>
> *Phelps v. United States*, 160 F.2d 858, 867–68 (8th Cir. 1947), *cert. denied*, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780 (1948) (quoted in *United States v. Harris*, 542 F.2d 1283, 1305

his question whether they were "dealing with some of the Herreras' dope." Furthermore, a Government agent testified that the initials R.H.M. appeared on the garbage cans behind 2831 S. Homan. Medina's theory of defense at trial was to attack any showing of a connection between Medina and the other conspirators. In rebuttal, the Government portrayed Medina as the head of the heroin trafficking operation. During the rebuttal portion of its final argument, the Government argued:

> Here he is touted as being Mr. Rodolfo Medina.
>
> Remember that trash can. You mark the trash cans . . . so that your neighbors can get it back to you . . . if the garbage collectors misplace them. What do the initials on the trash can say? R.H.M. Rodolfo Herrera-Medina. In his neighborhood it had significance for him. So, he could use it when he wants to.

It would appear that this statement could be justified by the evidence; it connected the defendant to the name Herrera, identified by the Vasquezes as their source. Medina moved for a mistrial, however, and although the trial court denied the motion at that time, it did say that it would reconsider the issue at post-trial motions. The court reprimanded Government counsel:

> I think, Mr. Cook, that you came close to committing reversible error.
>
> Although I am going to deny the motion, I think you deliberately tried to prejudice the jury by bringing this out. Counsel didn't argue it.

(7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977)).

4. In connection with this issue, the defendant's brief suggests that this court judicially note "that in the last twenty-four (24) or more months the news media in Chicago have frequently referred to the 'Herrera Family' within the context of narcotic [sic] trafficking." The suggestion fails to give us any specific data as to the frequency or volume of media reference. Without acceding, therefore, to the defendant's suggestion, we will nevertheless assume for the purposes of this appeal that the name Herrera may have been the subject of some media attention in connection with drug trafficking.

But, I am going to deny the motion at this point, and we can reconsider it at a later time during post-trial motions.

The court later granted the defendant's motion for a new trial based on these statements.

■ Medina argues that the conviction in the second trial must be reversed because the trial took place in violation of his right against double jeopardy. In granting the defendant's motion for a new trial, the trial court found that the prejudicial effect of the prosecutor's statement would make it "futile to take this case to the appellate court because I just think it would result in a reversal, and therefore I am going to grant a new trial to be held immediately." Assuming that the trial court correctly determined that the error was prejudicial, the test to be applied in determining the propriety of another trial was enunciated by this court in *United States v. Marrero*, 516 F.2d 12 (7th Cir. 1975), *cert. denied*, 423 U.S. 862, 96 S.Ct. 120, 46 L.Ed.2d 90:

> Our impression then, is that the test to be applied in cases wherein prosecutorial misconduct is alleged is simply whether the accused was insured of and accorded the genuine fairness to which he was entitled during the progress of trial. Such an evaluation, as we stated in [*Christman v. Hanrahan*, 500 F.2d 65 (7th Cir. 1974)] at 68, "requires an appraisal of the fairness of the complete trial." In the context of the instant appeal, we interpret this to mean that we must scrutinize the entire trial process—that is, the fairness or lack thereof in not one, but the two trials in which appellant was involved. If appellant was accorded a trial which was eminently fair and free from the taint of prosecutorial misconduct, then, as we interpret the applicable

law, the test of fairness has been satisfied . . . .

516 F.2d at 14–15. Thus, it is the general rule that a new trial untainted by the error is sufficient remedy for the error. *See United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

■ The defendant has not argued that his second trial was in any way tainted by the improper argument during the first. Rather, he argues that the prosecutor's conduct was "overreaching" and that a new trial was therefore banned under *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).[5] In arguing that the prosecutor engaged in intentional misconduct, the defendant relies chiefly on the comments of the trial court at the time of the prosecutor's error. Significantly, however, the trial court found after the second trial:

> While this court found [government's] closing argument in defendant's [first] trial sufficiently prejudicial to warrant a mistrial, we do not find government counsel's conduct to be either grossly negligent or intentional. We therefore hold the defendant's subsequent re-trial was not barred by the Fifth Amendment's Double Jeopardy Clause.

The trial court's original remarks were made spontaneously and without giving the Government an opportunity to reply to the defendant's mistrial motion. Other than this statement by the trial court Medina has only the statement of the prosecutor itself to support his claim of overreaching. This statement was an isolated incident and was at least arguably based on evidence at trial. We therefore decline to reverse the trial court's ruling on the issue of aggravating circumstances. We cannot in fairness say that the prosecutor lost sight of his funda-

5. Although the case before us involves a defense motion for a new trial rather than a defense motion for a mistrial which was the subject of *Dinitz*, we see no reason for differentiation between these situations. The Government admits that the ruling in this case was essentially a reserved ruling on the mistrial motion. Furthermore,

[a] defendant is no less wronged by a jury finding of guilt after an unfair trial, than by a failure to get a jury verdict at all; the distinction between the two kinds of wrongs affords no sensible basis for differentiation with regard to retrial.

*Tateo, supra*, 377 U.S. at 467, 84 S.Ct. at 1589–1590.

mental duty to see that justice is done,[6] nor could we even say that this statement alone shows an intentional effort to provoke a mistrial request. The defendant's double jeopardy claim must therefore fail.

■ Finally, Medina has argued that his rights to due process and effective assistance of counsel were violated by his attorney's representation of two of Medina's co-indictees. According to Medina, the trial court had an affirmative duty to inquire on the record about the hazards of joint representation. This argument is without merit. This Circuit has consistently declined to fashion a per se rule under the Constitution or its supervisory powers creating an affirmative duty in the trial court to inquire into every incident of joint representation to determine whether it involves a conflict of interest. *United States v. Mavrick*, 601 F.2d 921 (7th Cir. 1979); *United States v. Mandell*, 525 F.2d 671 (7th Cir. 1975), *cert. denied*, 423 U.S. 1049, 96 S.Ct. 774, 46 L.Ed.2d 637 (1976).[7] We have delineated the trial court's duty in this way:

> [The court must] be alert for indicia of conflict at all stages of the proceeding, including during trial. . . . When the possibility of a conflict appears during trial, the court must investigate the relevant facts, advise the defendant, and determine whether continued representation, absent waiver, would violate the sixth amendment.

*United States v. Gaines*, 529 F.2d 1038, 1043 (7th Cir. 1976) (citations omitted).

■ The defendant's argument fails because it does not distinguish between mere joint representation and the possibility or indicia of an actual conflict. One of the co-indictees, Lopez, posted bond, disappeared, and has remained a fugitive from justice. The defendant has alleged no actual conflict as to the representation of Lopez.

The other co-indictee, Alcantar, entered a plea of guilty on the day that Medina's first trial began and was sentenced prior to Medina's second trial. As to the representation of Alcantar, the defendant argues:

> [T]he allegation of passing a bag from Alcantar to Medina on September 8, 1977, could only have been disputed by Alcantar and/or Medina. Medina elected not to testify and Alcantar was the only other witness.

The mere fact that Alcantar might have testified in the defendant's trial does not indicate an actual conflict. By the time of the second trial, which is under review here, Alcantar not only had pleaded guilty, but also had been sentenced. Medina's allegations show no connection between the attorney's continuing duty to Alcantar after sentencing and Alcantar's failure to testify in Medina's trial. Medina has shown us nothing in the record before the district court to indicate that Alcantar's testimony would have been helpful in any way. Most important, however, is that the defense counsel, to whom we have entrusted the primary responsibility in this area, *see Mandell, supra*, 525 F.2d at 677, never alerted the district court in any way to possible problems with joint representation. Accordingly, we hold that the district court had no affirmative duty of inquiry.

For the above reasons, the judgment of conviction is affirmed.

---

**6.** Medina has argued that a showing of "gross negligence" constitutes overreaching sufficient to invoke the bar of double jeopardy, citing *United States v. Crouch*, 566 F.2d 1311 (5th Cir. 1978). Neither the Supreme Court nor this Circuit has so held, and we expressly decline to decide this issue until it is squarely presented by the facts.

**7.** This duty of inquiry has changed as of August 1, 1979, for federal prosecutions under the recently approved amendment to Fed.R.Crim.P. 44. *See United States v. Mavrick, supra* at 929 n. 9.