**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Fred H. LANGER, Defendant–Appellant.**

**No. 90–3783.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1991.

Decided April 28, 1992.

Melvin K. Washington, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

David P. Geraghty (argued), Coffey, Coffey & Geraghty, Milwaukee, Wis., for defendant-appellant.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

BAUER, Chief Judge.

These facts are the stuff from which a segment on *Sixty Minutes* could be made: *Water, Water Everywhere, Nor Any Drop to Drink: Defense Subcontractor Fraud.* The segment opens with interviews of persons familiar with the facts surrounding this defense contract. In July 1983, the United States Air Force, through the Warner Robins Air Logistics Center ("Warner Robins" or "Defense Department") at Robins Air Force Base, Georgia, solicited bids for construction of thirteen 5000–gallon capacity tank-type potable water distributor semitrailers with accompanying technical manuals. The solicitation specified that the trailers were to be built in accordance with Military Specification 62080B ("Mil.Spec. 62080B"). In the simplest possible terms, a single trailer was to consist of a water tank mounted on a chassis, the

chassis mounted on wheels, with cabinets attached to the underside of the tank for storage of accessories. The units also were to include a spraybar assembly for spraying water, and a winch to raise and lower the spraybar. Military Specification 62080B set out, in exacting detail, the precise materials and assembly of the trailer and its component parts. The primary purpose of these trailers was to transport potable water to service women and men in the field. For that reason, they were required to be constructed of stainless steel. Other metals are not safe for drinking water. Their secondary purpose was to supply firefighting vehicles with water and to spray water on the ground to control dust.

Through the Small Business Administration's ("SBA") minority-owned business set-aside program, Central Manufacturing Corporation of Milwaukee, Wisconsin ("Central"), was awarded the contract in September 1984. Under the terms of the contract, Central was to construct a "First Article" (military jargon for prototype) that complied with Mil.Spec. 62080B. When constructed, the Defense Department would accept it only if it passed a "First Article Test," the results of which would be shown on a "First Article Test Report" ("FATR"). The purpose of the FATR was to ensure that the prototype met Mil.Spec. 62080B. The contract required Central to conduct the First Article Test and to prepare the FATR. After the prototype successfully passed the test and was accepted by the Defense Department, the remaining twelve trailers would be constructed using the prototype as a manufacturing standard: each would be built *exactly* as the First Article had been built.

The contract itself was between the SBA and the Defense Department, and incorporated the SBA contract with Central. The agreed price for all thirteen units was $1,055,529.20, which was increased to $1,078,342.64 after an amendment to the contract in February of 1986. Although the Defense Department would not make progress payments to Central until after the prototype was approved, the SBA could (and did) advance sums to Central in the meantime. When it was paid by the De-

fense Department, Central then would repay to the SBA the amount advanced.

The segment's focus now turns to the building and testing of the water tank trailers. During the time that Central was developing its proposal to the Defense Department, Irvine Palmer, Central's president, became concerned that Central would have some engineering difficulties in building the tank trailers as well as developing the technical manual. While the Defense Department and Central were negotiating the contract, Palmer obtained the government's permission to subcontract certain work, which included engineering and production of the manual. The name Fred Langer, a partner in Magnum International, Ltd. ("Magnum"), came up. Some months earlier, Palmer had been introduced to defendant Langer. At that meeting, Langer told Palmer that he was an engineer, having graduated from the Milwaukee School of Engineering ("MSOE"), which was Palmer's alma mater. (At various times, Langer told people connected with the water tank trailer project that he was a degreed, certified engineer, had attended MSOE for two years, and had a bachelor of science degree in nuclear engineering technology. At trial, however, the evidence showed that Langer had attended MSOE for only one quarter, and for his efforts that quarter received three F's and one C.)

Palmer and Langer entered into negotiations on behalf of their respective companies to subcontract certain work to Langer. During the negotiations, Langer proposed to keep the production cost to Central to $810,000. The negotiations resulted in two contracts. Under the first contract, Langer would provide technical and engineering services, management of subcontracting, on-site management of production activities, and development of the technical data and manual. For these services he would be paid a base salary of $81,000 and an additional bonus of $25,000 on the first $25,000 savings under the $810,000 figure, and 30 percent of any further savings after the first $25,000. Among the services Langer agreed to provide under the second

contract was procurement of all component parts and subcontracting of all required assemblies, and preparation of the First Article Test Report to applicable military standards. For these services, Langer would receive $105,000.

Production on the prototype began. Langer brought Thomas Krill, who had done work for him before, to Central with him to supervise the production. Everything that went into construction of the trailer, except the water tank itself and the spraybar, was procured and assembled at Central. Completed purchase orders from Central to supply houses required the signature of Central's production manager, George Gillis. As time passed, however, Palmer permitted Gillis to sign purchase orders in blank after Langer presented him with a list of needed items. Gillis left it to Langer to fill in the order. Some of the purchase orders showed Magnum (Langer's company) as the supplier. Because Palmer trusted Langer's knowledge and abilities, and because Langer showed Palmer how and where to save money on purchases, Palmer accepted Langer's system of preparing purchase orders in blank.

Thomas Krill was more familiar with Langer's use of the purchase orders than anyone at Central. He knew that Langer had Magnum purchase needed items, and then use a Central purchase order to mark up and resell the items to Central. Krill gave two examples at trial. The first was the assembly for the spraybar—Langer doubled its price when he resold it to Central. The second was a fire monitor, which is a length of black pipe with a hole in it into which a pressure gauge was threaded. To obtain the pipe for this item, Langer sent Krill across the street to a hardware store, where Krill paid for it out of pocket, and then Langer marked up the price considerably and resold it to Central.

Although not possessing any technical or engineering training, Krill began to question Langer's use of materials for the prototype. Krill and Langer disagreed, several times, about the metals used for the piping and plumbing. Langer used variously aluminum, galvanized steel, or black pipe. Krill, aware that the specifications required stainless steel, questioned Langer about it. But Langer, offering a confusing explanation about piping being different from plumbing, and military specifications that Krill was unaware of, convinced Krill that those metals would be acceptable. Moreover, Langer explained, galvanized steel is much easier to work with than stainless steel. (As Krill later found out, galvanized steel is also eight to ten times less expensive than stainless steel.)

Production of the prototype continued and neared completion. Krill continued to be concerned about what he thought was a patchwork of aluminum and galvanized steel and black pipe—a patchwork that would not be visible to the naked eye at the First Article Test because it had been painted over. Krill continued to voice his concerns to Langer. Then, just days before the First Article Test was to occur, Krill discovered that a strainer necessary to prevent foreign objects from getting into the water pump had not been installed on the prototype. He told Langer, who said, essentially, nevermind, there's no time to put one on before the First Article Test; we'll do it later. As it happened, however, the missing strainer was never installed. The First Article Test came off without a hitch. Langer prepared, signed and submitted the FATR, and the Defense Department representatives on hand accepted the prototype. And Langer fired Krill. Krill then went to Palmer with his concerns, but Palmer dismissed Krill as a malcontent who lacked Langer's technical expertise. So Palmer paid no attention to Krill. He should have.

The segment's final series of interviews centers around the remaining units. After the Defense Department accepted the prototype, the other twelve units were constructed in conformity with the prototype. During this period, Central requested, and received, progress payments from the government totaling $1,001,646. Finally, the trailers were ready for delivery to the military, but Langer had not yet turned over to Central the final version of the technical manual. So the trailers sat at Central, and sat, and sat. The proceedings

were at a stalemate. The contract required Central to turn over the trailers and the manual. But Langer would not turn over the manual, claiming first that the government had to approve two modifications, and more importantly, that Central still owed him $9,000 for work on the manual. (He had already been paid a total of $95,000 for his services. Add to that his profit on the resale of supplies from Magnum to Central.)

In the meantime, Krill voiced his complaints to Bob Wetter and Earl Pergande at the Defense Department. The military sent Gary Moyses, a mechanical engineer with the United States Air Force, to inspect the trailers at Central. He determined that the trailers had not been constructed in accordance with Mil.Spec. 62080B. The deficiencies, most of which are not recounted here, included that the plumbing system incorporated short-radius elbows although the contract called for long-radius; the underslung cabinets were not built to the specified dimensions; the battery support brackets in the cabinets were corroding; the exhaust system was mounted in such a way that exhaust gases would be recirculated through the engine compartment; the fuel tank cap was practically inaccessible; the units were not rustproofed; certain of the pipes were galvanized steel rather than stainless; and the winch and spraybar supports were not substantial enough to hold up the spraybar.

Ultimately, the government entered into a contract with William Godwin, of Spokane, Washington, to rehabilitate the thirteen trailers. Much of the piping and plumbing had to be replaced because of corrosion, but that which remained was unsafe for use with drinking water. The plumbing system had to be re-installed because it had been positioned incorrectly to allow for suction from a supply of water lower than the pump itself. Godwin completely redesigned the underslung cabinets, and moved the fuel tank for easier access. He also redesigned the spraybar winch and supports. But he could not make the water tank trailers fit for potable water. The work he did simply made the trailers fit for their secondary purpose: firefighting and dust containment. Under his contract, he was paid $225,000.

A federal grand jury sitting in Milwaukee, Wisconsin, returned a five-count indictment against Fred Langer. Count one charges mail fraud, in violation of 18 U.S.C. §§ 2 and 1341. Counts two through five charge Langer with fraudulently representing in the FATR that the trailers had been constructed in accordance with Mil.Spec. 62080B, specifically subparagraphs 3.5.1 (material used for piping), 3.1.1.2 (rustproofing), 3.7.7 (material used for plumbing coupling), and 3.7.1 (material used for underslung cabinets), all in violation of 18 U.S.C. § 1001. A jury convicted Langer on all counts. After a hearing, the trial judge sentenced Langer on count one to two years imprisonment, and fined him $10,-000.00. Imposition of sentence on counts two through five was suspended, but the trial judge placed Langer on probation for a period of four years, to follow his prison term on count one. The judge also ordered Langer to make restitution to the government in the amount of $251,250.37, payable by him in monthly installments of not less than $300.00. Langer filed a timely notice of appeal.

The interviewer would then close the segment with a question posed by the prosecuting attorney in his final argument (Trial Transcript at 830): "The case is a troubling one in many respects, because it no doubt is one that causes you to think, as I did from the commencement of my involvement in this matter to this very moment, and that is why, despite all of the financial rewards that was [sic] in it for this defendant, why would he or anyone, given the noble and the profound opportunity given to them, set out to scam the government and, moreover, why do so in such a way as to cause or risk harm to the safety of other people?" Why indeed.

We have presented these facts, taken directly from the trial transcript, as the producers of *60 Minutes* might present them to their audience, the court of public opinion. We are, however, a court of law. Therefore, we will address Langer's legal arguments with all due seriousness.

## I.

Langer frames his first two arguments in the alternative, both of which he raises for the first time on appeal. He argues that the government failed to offer sufficient evidence to establish that, as a part of a scheme to defraud, he caused a progress payment check from the government to be delivered through the United States mail, as alleged in count one of the indictment. In the alternative, if the evidence offered was sufficient to establish mail fraud, he claims that that was the direct result of his trial counsel's failure to render effective assistance.

■ Langer's sufficiency challenge, because he failed to raise it below, is waived unless there is a showing of plain error. *United States v. Henry*, 933 F.2d 553, 558 (7th Cir.1991). *See also* FED. R.CRIM.P. 52(b). Plain error occurs when there has "been such a miscarriage of justice that, but for the error, [defendant] would have been acquitted." 933 F.2d at 538. The facts here do not reveal a miscarriage of justice. The government offered the testimony of Irvine Palmer, president of Central, to establish, among other things, the mailing necessary for count one. During his direct examination, the following exchange occurred between Palmer and the prosecutor:

Q. All right. Now, how did you get the checks from the government?
A. The checks were sent—we had an account at a bank for this particular account; and the checks were sent from the government to that account.
Q. All right. How was it sent.
A. It was mailed.

Trial Transcript at 276–77. Standing unchallenged, Palmer's testimony is sufficient evidence to establish the mailing necessary for a conviction of mail fraud. We see no plain error. Accordingly, we deem this argument waived.

■ It is precisely because Palmer's testimony went unchallenged that Langer raises his alternative ineffective assistance of counsel argument. Customarily, however, we would not review a claim of ineffective assistance of counsel raised initially on appeal. *United States v. Limehouse*, 950 F.2d 501, 503 (7th Cir.1991). We make an exception when the issue is, as here, sufficiently clear-cut. *Id.* Our review begins with the presumption that Langer received reasonably professional assistance. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). If he can show that trial counsel's assistance failed to meet constitutional requirements and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[,]" *id.*, he then can overcome that presumption. We proceed mindful that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■ Langer bases his claim on trial counsel's (1) failure to cross-examine Palmer regarding his personal knowledge that the check was mailed; (2) failure to submit a jury instruction regarding use of circumstantial evidence to prove mailing; and (3) apparent concession regarding mailing in his closing argument. All of this, he argues, significantly prejudiced him. Unhappily for Langer, however, he cannot show that had trial counsel pursued a different strategy it is reasonably probable that a different result would have been obtained. For example, even if Langer's counsel had shown on cross-examination that Palmer had no personal knowledge of the use of the mails to deliver the progress payment checks the government easily could have offered additional witnesses to establish that element of the charge. Similarly, we are not convinced that had the judge given the jury an additional instruction, or had trial counsel not conceded mailing, Langer would not have been convicted on count one. His argument offers only remote possibilities, not the reasonable probabilities *Strickland* requires. Consequently, because Langer's ineffective assistance claim does not undermine our confidence in the outcome below, his conviction on count one stands.

## II.

Langer next raises three challenges to the sufficiency of the evidence. Specifically, he argues that there was insufficient evidence to prove, beyond a reasonable doubt: (1) that he fraudulently represented the water storage trailers were rustproofed, as alleged in count three of the indictment; (2) that he fraudulently represented the trailer's underslung cabinets were made with specified materials, as alleged in count five; and (3) that he intended to defraud the government, as alleged in counts two, three, four and five. We will consider each of these arguments in turn.

### A.

▮▮▮ In his challenges to the sufficiency of the evidence, the onus is on Langer. We view the evidence in the light most favorable to the government, and reverse only if no rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime alleged. *United States v. Williams*, 951 F.2d 853, 859 (7th Cir.1992). In the first of Langer's insufficiency arguments, he maintains that the evidence at trial failed to prove the conduct alleged in count three: that he falsely represented in the FATR that the prototype water trailer conformed with subparagraph 3.1.1.2 of Mil.Spec. 62080B, which required that the water trailer be rustproofed. He concedes that the government proved he prepared the FATR, and he concedes that the prototype vehicle was not rustproofed. So Langer bases his contention on the lack of a *specific* reference to subparagraph 3.1.1.2 in the FATR's test summary sheets. The test summary sheets contain the results of the tests performed, specification by specification, on the prototype vehicle to establish its conformity with the contract. And Langer is correct, the test summary sheets omit a specific reference to 3.1.1.2, proceeding directly from 3.1.1.1 to 3.1.1.3. FATR at 6, Government Exhibit 14–1. What he overlooks, however, is the reference contained in section 16 of the FATR's report summary sheet, which reads:

Semitrailer, Tank submitted for testing and inspection meets or exceeds the requirements of MIL–S–62080B, 8 November 1979, specifically Section 1, paragraph 1–2, Section 3, *paragraphs 3.1 thru 3.15.1*, Section 4, paragraphs 4.1 thru 4.4, and all amendments as included.

*Id.* at 4 (emphasis added). The reference is to a series of specifications, which includes subparagraph 3.1.1.2. This evidence establishes that the FATR represented that the vehicle had been rustproofed. That, together with the evidence that Langer prepared the FATR and the vehicle was not rustproofed, is sufficient evidence from which a rational trier of fact could have found Langer guilty beyond a reasonable doubt. Langer's conviction on count three, therefore, stands.

### B.

He next challenges the evidence offered on count five, which charged that Langer submitted a "form which falsely ... reflected that the first article water storage trailer ... had been built in accordance with subparagraph 3.7.1 ..., which required that the trailer be built to specific military specifications, *among which were that the trailer's underslung cabinets be made with the proper materials.*" Indictment, Record Document 1, at 14 (italics used to facilitate discussion).

We find no evidence showing that the materials required by subparagraph 3.7.1 were not used. There is, however, evidence that various other requirements of subparagraph 3.7.1 were not fulfilled. Defendant treats the italicized language as limiting the charge of falsity to the use of improper materials. The government does not point to evidence that the materials did not comply with subparagraph 3.7.1, but relies on other deficiencies. It seems, without saying so, to treat the italicized language as surplusage, and to read count five as if that language were not present. On appeal, the parties have argued this point by detailing the evidence without specifically addressing the proper interpretation of count five, and the italicized portion of it.

Our reading of the record satisfies us that at trial the parties and the court gave the italicized language the limiting effect for which defendant contends.[1] We think the government cannot fairly treat the italicized language as surplusage now. Because we have found no evidence at all that the cabinets were constructed with some material other than the required 16–gauge steel, Langer's conviction on this count cannot stand. As to count five, therefore, we reverse.

### C.

 In his remaining sufficiency challenge, Langer claims the government's evidence failed to establish that he intended to defraud the Defense Department as alleged in counts two, three and four.[2] This argument is meritless. First, as to count three, Langer admitted at trial that the trailer was not rustproofed. There is no evidence that he ever informed any of the government officials present at the First Article Test of that fact. Indeed, by his deliberate omission of a specific reference on the FATR's test summary sheet to the subparagraph that required rustproofing, he concealed its absence and, until his entire scheme was exposed, avoided having to answer any questions about it.

As to counts two and four, Thomas Krill, the man defendant hired to supervise on-site production at Central, testified that he had repeated discussions, even disagreements, with Langer about the materials used in the piping and the coupling. Langer insisted on using, variously, aluminum, galvanized steel or black pipe for the piping and coupling. The specifications for both the piping and coupling called for stainless steel. Langer, using some dubious technical double-talk, was successful for a time in convincing Krill that the materials were appropriate. But when Krill continued to object, Langer fired him. Moreover, that inappropriate materials had been used was not visible at the First Article Test because the piping and coupling the defendant installed had been painted over. All of this is overwhelming evidence from which a rational trier of fact could conclude beyond a reasonable doubt that Langer intended to defraud the government. Consequently, his convictions for intent to defraud on counts two, three and four stand.

### III.

 In the last of his challenges to his conviction, Langer argues that the trial court committed reversible error when it refused to instruct the jury on the definition of reasonable doubt. He acknowledges that the position this Circuit has taken is that no such jury instruction should be given. *See United States v. Mitchell*, 957 F.2d 465, 468 (7th Cir.1992); *United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir.1988); *United States v. Dominguez*, 835 F.2d 694, 701 (7th Cir.1987); *United States v. Allen*, 596 F.2d 227, 230 (7th Cir.), *cert. denied*, 444 U.S. 871, 100

---

**1.** At the close of all the evidence the defense moved for a directed verdict of not guilty on all counts. Counsel argued most aggressively that the government had not proved the allegation contained in count five. In ruling, the trial judge stated:

I'm not, frankly, disagreeing with your position [regarding count five], particularly when the count charges that the cabinetry was not made out of the proper material as opposed to the right dimensions and improperly ventilated and too close to the fuel cap on the diesel engine and so on and so forth. I think they are two different issues; and I am going to, as with all of the motions to dismiss, reserve ruling on it pending the jury's determination since I don't, as I've just stated, want to send the wrong message to the jury with regard to they [sic] feeling, well, the court took one

count away, does that mean the court's putting its imprimatur on Counts One through Four.

Trial Transcript at 788–89. We find it curious, however, that after the jury returned a guilty verdict as to all counts, the judge denied the defense motion for judgment notwithstanding the verdict on all counts. Because a transcript of the hearing on the JNOV motion was not included in the Record on Appeal, we have no understanding why the trial judge did not follow his initial inclination to grant the motion as to count five.

**2.** Langer also challenged the sufficiency of the evidence of his intent to defraud as alleged under count five. Because we reverse his conviction on count five for failure of proof, we need not consider his argument as it relates to that count.

S.Ct. 149, 62 L.Ed.2d 97 (1979); *United States v. Lawson,* 507 F.2d 433, 443 (7th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).

Langer nonetheless invites us to reconsider our position. We decline the invitation. It has been, and continues to be, "our opinion that any use of an instruction defining reasonable doubt presents a situation equivalent to playing with fire." *United States v. Shaffner,* 524 F.2d 1021, 1023 (7th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). Any attempt to define the term requires use of additional terms which themselves require definition. And that would tend to confuse, rather than clarify, matters for a jury. As our Committee on criminal jury instructions stated, "The phrase 'reasonable doubt' is self-explanatory and is its own best definition." Instruction 2.07, Definition of Reasonable Doubt, Federal Criminal Jury Instructions of the Seventh Circuit. There was, therefore, no error in the trial judge's refusal to give an instruction defining reasonable doubt.

### IV.

■ Defendant's final arguments are directed at the restitution order the district court entered at his sentencing. He claims, alternatively, that he has no restitution obligation, or failing that, the amount of restitution ordered exceeds the scope of his convictions.

A district court's authority to order a defendant to pay restitution is found in the Victim and Witness Protection Act, 18 U.S.C. § 3663. Because Langer disputed the amount of restitution at his hearing, the government was required to prove that amount by a preponderance of the evidence. *See* 18 U.S.C. § 3664(d). Langer claims that any restitution order should

encompass only the cost to rustproof the trailers. Any rehabilitation work the government paid for, he continues, was unnecessary because, as constructed under the contract, the trailers were not fit for their primary purpose, i.e. potable water, and as rehabbed, they are still not fit for their primary purpose. What this argument lacks in merit it makes up in arrogance. Langer blindly ignores the overwhelming evidence, offered both at trial and at the sentencing hearing, that until they were rehabilitated, the trailers were nothing more than lawn ornaments sitting in Central's yard, unfit for either their primary or secondary purpose. Thus, the government clearly met its burden.

As to his alternative argument, Langer maintains that the restitution imposed was excessive because it disregarded whether the criminal conduct alleged in the indictment caused the loss.[3] He specifically challenges the amounts attributable to refurbishing the underslung cabinets and installation of stainless steel pumps. Had Langer not been convicted of mail fraud under 18 U.S.C. § 1341 we would agree with him.

In *United States v. Hughey,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the Supreme Court held that the Victim and Witness Protection Act requires that a restitution order must be limited to "the loss caused by the conduct underlying the offense of conviction." *Id.* 110 S.Ct. at 1984. After *Hughey,* in *United States v. Bennett,* 943 F.2d 738 (7th Cir.1991), we held that "[p]roof of a scheme is an element of the offense of mail fraud, and therefore, actions pursuant to that scheme should be considered 'conduct that is the basis of the offense of conviction.' " *Id.* at 740. The conduct that is the basis of Langer's conviction under § 1341 is a scheme to defraud described in the indictment,

---

**3.** The specific amounts in the restitution order are:
 • $102,198.20 for the rehabilitation work directly attributable to the trailers' deficiencies as Langer built them;
 • $68,289.93 for stainless steel piping;
 • $95,680.00 for installation of stainless steel pumps;

 • $357.24 for rustproofing.
These figures total $266,525.37. The judge then deducted $15,275.00 for the salvage value of the galvanized pumps, plumbing and valves. Consequently, the total amount of the restitution order is $251,250.37.

which specifically alleges that between October 22, 1984 and the date of the indictment Langer

knowingly and willfully devised and intended to devise a scheme and artifice to defraud the United States, its departments and agencies, more particularly the United States DOD, the United States Air Force [and other agencies of the United States], and to obtain money from the United States by means of false and fraudulent pretenses, representations, and promises, while fully aware that the pretenses, representations and promises would be, and were false and fraudulent when made....

Further,

It was an object and purpose of the scheme and artifice to defraud that the defendant, through false, fictitious, and fraudulent means, would cause the United States, through its various departments and agencies, to pay, through Central to Magnum, money to which the defendant, Central and Magnum were not entitled.

Indictment, Record Document No. 1, at 6. The scheme thus described, that between specific dates and by means of specific conduct, Langer defrauded the government out of money to which he was not entitled, meets the requirements of *Bennett. See also United States v. Brothers*, 955 F.2d 493, 496 (7th Cir.1992) ("The district court had the authority to order restitution for the losses caused by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial.").[4] The amount of the restitution order properly covers all the losses caused by Langer's scheme and, therefore, is not excessive.

### V.

For the foregoing reasons, Langer's convictions on counts one through four, and the restitution order, are AFFIRMED. His conviction on count five, however, is REVERSED, which requires the case to be REMANDED to the district court for resentencing.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment and opinion of the court, and write separately only to clarify what I understand to be the court's resolution of two issues.

First, with respect to our reversal on count five, I wish to emphasize that the government's fundamental problem was not a lack of evidence that the underslung cabinets were improperly constructed, but a poorly drafted indictment. The final clause of count five, italicized in the opinion, focused the charge on the allegation that the cabinets were not constructed with the required 16-gauge steel. As the opinion notes, the court interpreted this clause as having such a limiting effect. In defense of count five, Mr. Langer introduced testimony from several witnesses that the cabinets were in fact constructed with the proper materials. Indeed, there was no evidence whatsoever that the cabinets were constructed of improper materials. Nevertheless, the jury found Mr. Langer guilty of count five, presumably because the government introduced evidence that the cabinets were defective in several other respects. Thus, the proof at trial varied materially from allegations in the indictment, as construed by the court and Mr. Langer. Mr. Langer thereby received insufficient notice of charges ultimately proved. This variance is fatal to the conviction on count five. *Cf. Bae v. Peters*, 950 F.2d 469, 479 (7th Cir.1991).

Second, with respect to the scope of the restitution order, I wish to emphasize that the scheme alleged in the indictment was broad enough to encompass misrepresentations that were not singled out as separate counts in the indictment, but specific

---

**4.** As we noted in *Brothers*, 955 F.2d at 497, n. 3, the 1990 amendment to the Act conforms to our holding in *Bennett.* Amended § 3663(a)(2) reads:

For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern.

enough to meet the requirements of *United States v. Hughey*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). As we stated in *United States v. Bennett*, 943 F.2d 738, 741 (7th Cir.1991), a scheme must be defined with specificity in order to support independently a restitution order: "The scheme concept is an amorphous one, and may only support an award of restitution if it is defined with specificity. A contrary rule would allow vague allegations to support restitution based upon broad, unsubstantiated conduct." The district court was careful to limit the restitution order to repairs necessitated by the scheme alleged in the indictment. From the total cost of retrofitting the vehicles, the court deducted costs associated with the two-year delay in retrofitting, costs stemming from regulatory bidding requirements, and, as noted in footnote 3, the salvage value of galvanized steel parts used by Mr. Langer, which did not meet contract specifications. Finally, because the court did not include costs associated with the materials used in constructing the underslung cabinets, our reversal of the conviction on count five does not require a modification of the restitution order in that respect.