No. 2452.

## MARTIN GUEST *v.* THE STATE.

1. THEFT—INTENT—CHARGE OF THE COURT.—Felonious intent is the essential ingredient of theft, and, to constitute that offense, the taking must, in the first instance, have been fraudulent, and if the possession be obtained lawfully, no subsequent appropriation, however fraudulent the intent, will suffice to constitute the taking theft, unless such lawful possession was obtained by means of false pretext, or with the fraudulent intent, at the very time of the taking, to deprive the owner of the value of the property and appropriate the same to the use and benefit of the taker. See the opinion for a requested charge, which, harmonizing with this doctrine, was, in view of the facts in proof, erroneously refused.

2. SAME.—Note a case in which the trial court should have given in charge to the jury the established doctrine, that, "in cases where there is evidence from which the jury might infer that the taking was not fraudulent, it is the right of the defendant to have them clearly instructed as to the distinction between trespass and theft."

APPEAL from the District Court of Red River. Tried below before the Hon. D. H. Scott.

The conviction in this case was for the theft of four head of cattle, the property of John R. Johnson, in Red River county, Texas, on the fifteenth day of April, 1887. A term of two years in the penitentiary was the penalty assessed against the appellant.

John R. Johnson was the first witness for the State. He testified that he lived in Red River county, Texas, and was the owner of the four head of cattle described in the indictment. Those animals were taken from their range, near witness's ranch place, in Red River county, Texas, about the middle of April, 1887. They were then in the witness's possession, and were taken without his knowledge or consent. On a certain Sunday in the said April, a Mrs. Johnson, who then lived on the defendant's ranch, gave the witness information which led him to believe that the defendant had the animals. Accordingly, on the following Friday, the witness went to the ranch of Mr. Jack Garner, which was situated in the edge of Lamar county, about twenty-five miles distant from the witness's ranch. At Garner's ranch the witness found Jack Garner, defendant and

several persons whom he did not know. Witness asked the
defendant about his four head of cattle, and the defendant re-
plied either that he had one or had some of them. In the same
connection the defendant said that, when he left the range
with his own cattle, the four head belonging to witness forced
their way into his herd, and that, although he cut them out
several times, he could not keep them from rejoining his herd;
that finally, when they had followed his herd beyond the
limits of the range, he gave up his attempts to exclcde them
from his herd, fearing that if he left them beyond the range
they would stray off and be lost to witness, and that he drove
them from that point with his herd, intending either to pay wit-
ness for them, or to replace them to witness with other animals
of like character and value, which he claimed to have on the
witness's range. At the same time and place the defendant pro-
posed to pay witness for the cattle, or to replace them with
other animals on the range, or to drive them back whence he got
them, as witness should elect. Witness preferred his own
animals, whereupon defendant delivered them to witness, and
helped him drive them a part of the way back to their accus-
tomed range. Three of the animals had been placed in the J G
brand, which the witness understood was Jack Garner's brand.
One of those three animals was a bull when taken, but had been
altered when recovered. The fourth was a cow. She had not
been rebranded. The witness's brand was a J. That letter on
the yearling, one of the three animals rebranded, was almost
entirely obliterated by the J in the J G brand, which was placed
over it. The several parties at Garner's ranch, except the
defendant, were branding cattle when the witness reached the
ranch. Defendant was then eating a meal, and was taking no
part in the branding. Defendant told witness that he had sold
the cattle to Jack Garner. Thirty or forty head of defendant's
cattle were in the bunch driven from the range frequented by
witness's cattle. Defendant left some cattle on that range, but
witness did not know how many. The cattle of the defendant
and those of the witness ran on the same unfenced range, and
the houses of their respective herders were about two miles apart.
The bull had just been castrated, and he and the two other
animals freshly branded and marked, when witness reached
Garner's ranch. Defendant told witness that he had intended
to return to the range on the following Sunday to notify witness
of his having witness's cattle. The cattle were thin when

taken. The road over which the witness was told the cattle were driven was a public road. Defendant was well acquainted with witness's cattle. Jack Garner, to whom the defendant sold the cattle, was the defendant's brother-in-law.

C. M. Palmer was the next witness for the State. He testified that he was well acquainted with the defendant and J. R. Johnson, and knew their respective stocks of cattle, which ran on the same range in Red River county. On the day prior to the alleged theft, the witness, being then on the range, saw the defendant and Mr. Catchings, who worked for defendant, driving a small bunch of cattle from the range towards the defendant's stock lot. That bunch included two of defendant's cattle, and seven or eight head which belonged to J. R. Johnson. Witness particularly noticed in that bunch a certain cow and yearling belonging to Johnson. They were two of the animals afterwards recovered by Johnson in Lamar county and brought back to the range. Neither defendant nor Catchings made any effort to cut Johnson's cattle from the bunch while witness saw them driving the animals, nor did defendant direct witness to tell Johnson that he, defendant, had driven the cattle, or that he could not separate them from his herd. Johnson's cattle were not following defendant's cattle when witness saw them, but were being driven along in the usual way. Witness thought at the time, to save trouble and labor, defendant was driving the bunch to his stock pen, where he would pen his own and exclude Johnson's animals.

Mrs. Martha Johnson testified, for the State, that, at the time of the alleged offense, she was living at the defendant's ranch house, about a mile and a half distant from J. R. Johnson's ranch house. Witness had a distinct recollection of the day that defendant drove off a part of his cattle. Defendant and his two employes, Catchings and Richardson, drove some of Johnson's cattle to the pens with some of defendant's animals. They penned those belonging to defendant, but did not pen the seven or eight head that belonged to Johnson. When they left, they turned defendant's thirty or forty head out of the pen and started to Lamar county with them. Witness learned, but did not know of her own knowledge, that some of Johnson's animals broke into defendant's herd, after the herd was started off. Witness saw the herd when defendant turned it out of the pen and started off, but did not know whether or not it included any of Johnson's cattle. Defendant left no word for Johnson with the witness. Mr. Johnson at that time lived about fifteen miles

from where the cattle were taken. The witness sent him word that it was important to him to come and see her about his cattle. He came, and witness told him that his cattle had been taken away.

James E. Catchings was the next witness for the State. He testified that he was in the defendant's employ at the time of the alleged offense, and assisted him to gather the cattle driven to Garner's, and went with him about nine miles on his trip to Garner's. Several of John R. Johnson's cattle got into the herd while they were being gathered. This was before the start to Garner's. Just before reaching defendant's pen with the herd then gathered, two animals broke from the herd and ran to a bunch of Johnson's cattle near Johnson's ranch. Witness and defendant went after and drove those animals to the pen, but penned only defendant's cattle, leaving Johnson's outside. Defendant drove off between forty and fifty head of cattle, leaving some that he owned on the range. None of Johnson's cattle were in the herd when defendant left his house for Garner's, but before he got out of the range several joined the herd despite the efforts of the defendant and witness to keep them out. They were cut out several times, but got back into the herd. When witness turned back to go home, one of his yearlings and Johnson's four cattle were cut out of the herd for witness to drive back to the range. Witness's yearling, however, ran off through the brush, and witness followed it, abandoning Johnson's four cattle. He did not know what became of Johnson's four head. He drove his own yearling home. Defendant made no effort to pen Johnson's cattle at any of the houses passed on the road, nor did he leave any word for Johnson that witness knew of.

James Harrell testified, for the State, that he lived on the public road (a lane at his place), about two miles from the range of Johnson's and defendant's cattle. The witness was at home on one Sunday morning in April, 1887, when the witness Catchings and another man drove a herd of forty or fifty head of cattle by his house. There was a good lot at witness's place, directly on the roadside. No attempt was made by Catchings or the other man to pen any cattle in that pen. Catchings passed witness's house going back towards defendant's ranch, after he had had time to go about six miles with the herd. If he then had a yearling with him the witness did not see it. Witness's house was about two hundred yards from the public road, and he could and did plainly see Catchings from that house when he passed going

back from the direction in which the herd was taken. The herd in charge of Catchings and the other man passed witness's house between ten and eleven o'clock. No loose cattle were then following the herd.

J. B. Butler testified, for the State, that defendant, Catchings and Richardson drove a herd of forty or fifty head of cattle by his house, on a Sunday, about the middle of April, 1887. Witness knew Johnson's cattle, but took no special notice of the cattle in the herd described. Witness's cattle lot stood about one hundred and fifty yards from the road over which the cattle were driven. Neither defendant, Catchings nor Richardson said anything to witness about putting cattle in that lot. The witness left home soon afterwards, and did not see Catchings going back. The State closed.

Calvin Richardson was the first witness for the defense. He testified that in April, 1887, he went on a visit to the neighborhood in which the ranches of the defendant and John R. Johnson were located. Defendant employed witness to help him gather 'a bunch of cattle and drive them to Garner's pasture, near Blossom Prairie, in Lamar county. When collecting cattle at defendant's ranch on Sunday morning, two steers stampeded from the bunch and ran to a point near Johnson's ranch. There they joined some of Johnson's cattle, and all the animals were driven to defendant's pen, where they were separated and defendant's animals penned and Johnson's left outside. Defendant's herd was then turned out and started to Blossom Prairie. None of Johnson's cattle were started with them, but four head persistently followed and broke into the herd, and, though they were cut out several times, they could not be kept out. They were cut out the last time with Catching's yearling, when Catchings started back to defendant's ranch. The four head soon rejoined the herd. This being about nine miles from the starting point, defendant said he would not cut them out again, as they would not go back to the range from there, and that he would either pay Johnson for them or replace them. The herd was then driven to Garner's place near Blossom Prairie, where witness heard defendant tell Garner that the herd contained four of Johnson's cattle, but that he would make it all right with Johnson by paying for or replacing the cattle. Garner's was reached on Sunday evening. When witness left to return to defendant's ranch on the next day, the defendant told him if he saw Johnson, to tell him about the four head of cattle, and that

he, defendant, would be back on the following Sunday, and make it all right with him. On the following Wednesday witness saw Johnson, and told him in part, but not all, of what defendant said. Witness remembered that he asked Johnson not to use his name, as defendant owed him, and he was afraid he would not get his pay. On his cross examination, this witness said that defendant told him, if he heard Johnson inquiring for his cattle, to tell him, Johnson, that he, defendant, would make it all right.

J. N. Garner testified, for the defense, that the defendant got to his place in Lamar county on the evening of the day he left home with the cattle. He delivered the herd to witness, the witness having purchased them, and told the witness at the time that four of Mr. Johnson's cattle were in the herd; that they broke into the herd despite his efforts to keep them out, but that he would either pay Johnson for the animals or replace them, as Johnson might elect. Witness was branding, marking and castrating the cattle when Johnson reached his ranch. He heard defendant explain to Johnson how the cattle got into his herd, and tell Johnson that he was ready to pay for, replace or drive the cattle back to the range. He also heard defendant tell Richardson, when Richardson left witness's house, to tell Johnson about his four animals, and that he would be home on Sunday and pay him for them. The defense closed.

J. R. Johnson, recalled by the State, testified, in rebuttal, that he met Richardson, whom he did not know, on the Wednesday following the theft of the cattle. In reply to questions, Richardson told him that the defendant took the cattle, and in that connection requested witness not to mention his name in a manner that defendant would hear of it; that the defendant had not yet paid him, and that he feared if the defendant found out that he had given him away, defendant would get mad and not pay him. He said nothing about the cattle breaking into defendant's herd, or being cut out, or that defendant had told him to tell the witness that he would be home Sunday and pay for the animals.

The motion for new trial raised the questions discussed in the opinion.

*Sims & Wright*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   As directly and pertinently applicable to the facts proven on the trial, we are of opinion the court erred in refusing the first special instruction asked for defendant, as follows, viz.:

"In order to convict the defendant of the crime charged in the bill of indictment, you must be satisfied beyond a reasonable doubt that he not only did appropriate the cattle of J. R. Johnson, as alleged in the bill of indictment, but that the intent of the defendant to deprive the owner of the value thereof (if you should find that such intent existed) existed at or before the taking; and in this connection I further charge you that, if you should find from the evidence that the cattle alleged to have been stolen followed defendant and got into his herd, and that afterwards he formed the idea of fraudulently appropriating the same to his own use and benefit, he could not be convicted of theft." There was no similar instruction embraced in or covered by the the general charge.   Under our statute, "the taking" essential to constitute theft "must be wrongful; so that if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft." (Penal Code, art. 727.)

The felonious intent is the essential ingredient of the crime, and, "to constitute theft, the taking of the property must, in the first instance, have been fraudulent; and, if the possession be obtained lawfully, no subsequent appropriation, however fraudulent the intent, will suffice to constitute the taking theft, unless such lawful possession was obtained by means of a false pretext, or with the fraudulent intent at the very time of the taking to deprive the owner of the value of the property and to appropriate the same to the use or benefit of the taker."   (Hernandez v. The State, 20 Texas Ct. App., 151; Morrison v. The State, 17 Texas Ct. App., 34; Atterberry v. The State, 19 Texas Ct. App., 401; McAfee v. The State, 14 Texas Ct. App., 668; Johnson v. The State, 1 Texas Ct. App., 118; Spinks v. The State, 8 Texas Ct. App., 125.)

Under the particular facts proven in this case, we are further of opinion that the charge did not present the law applicable to an important phase of the case.   It is a rule well settled that, "In cases where there is evidence from which the jury might infer that the taking was not fraudulent, it is the right of the defendant to have them clearly instructed as to the distinction

between trespass and theft." (Bray v. The State, 41 Texas, 203; Ainsworth v. The State, 11 Texas Ct. App., 339.)

We will not discuss the facts (which the Reporter will give fully), but content ourselves with the remark that, upon the matter of fraudulent intent at the time of taking, or whether they establish sufficiently a fraudulent intent at all, is a matter of very serious doubt in our minds.

For errors in the charge, as above pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 9, 1887.