Paul David **PAULSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 14–96–01492–CR.

Court of Appeals of Texas, Houston (14th Dist.).

April 22, 1999.

---

**908**

Joseph Salhab, Houston, for appellant.

David Bosserman, Angleton, for appellees.

Panel consists of Chief Justice MURPHY and Justices HUDSON and DRAUGHN.*

## OPINION ON REHEARING

J. HARVEY HUDSON, Justice.

Paul David Paulson was convicted by a jury of Class A misdemeanor theft. *See*

---

* Senior Justice Joe L. Draughn sitting by assignment.

1. Act of May 29, 1993, 73 rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3636–

TEX. PENAL CODE § 31.03.[1] His punishment was assessed at one year in the Brazoria County Jail and a fine of $1,500. Both the term of confinement and the fine were probated for a period of 18 months. In two points of error, Paulson contends his conviction should be reversed because the trial court (1) failed to define "reasonable doubt" for the jury and (2) violated his right to counsel at a pretrial hearing. We reverse.

On March 23, 1995, Sam Thomas, Jr., a teacher at Yates High School in Houston, was towing a wheeled barbecue pit behind his truck as he traveled from Houston to Brazoria County. When he lost a tire on the barbecue pit, Thomas was forced to pull onto the shoulder of the highway. Thomas removed the defective tire, uncoupled the pit, and left it on the shoulder while he went to have the tire repaired. When he returned less than two hours later, Thomas observed his pit being loaded into the back of appellant's truck. Thomas immediately confronted appellant. Appellant said, "How do I know it's your pit?" Thomas showed appellant the tire and explained that he had temporarily left the pit in order to have the tire repaired. Appellant refused to unload the pit from his truck, and Thomas returned to his truck to call the police. When appellant decided to drive off with the barbecue pit, Thomas followed him to a Houston apartment complex. Thomas called police and appellant was ultimately charged with theft.

### JURY CHARGE

■ In his first point of error, appellant contends the trial court erred in failing to give the jury a definition of the phrase "reasonable doubt." The trial court instructed jurors that they could not convict appellant unless they were convinced of his guilt "beyond a reasonable doubt," but the

---

38 (amended 1995, 1997)(current version at TEX. PENAL CODE ANN. § 31.03 (Vernon Supp. 1998)).

court did not further define or explain the concept.[2] Although appellant made no objection to the court's charge, he claims the court was nevertheless required to give the definitional instruction on reasonable doubt mandated by the Court of Criminal Appeals in *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App.1991).

In 1991, the Court of Criminal Appeals "enacted" a mandatory jury instruction defining the term "reasonable doubt." *Id.* The court further declared, in 1996, that the failure to submit such a charge to the jury, whether requested or not, constitutes "automatic reversible error." *See Reyes v. State*, 938 S.W.2d 718, 721 (Tex.Crim.App. 1996). We find, however, nothing in the history or logic of law that compels this conclusion.

As an intermediate appellate court we must defer to the decisions of the Court of Criminal Appeals, but we have no less an obligation by virtue of our intermediate status to avoid doing violence to the law. Thus, where a particular doctrine or decision of the Court of Criminal Appeals seems to us unsound, we have a duty to respectfully recite the reasons for our concern.

### The Origin of "Reasonable Doubt"

An intellectual crisis "occurred during the twelfth century, when 'irrational proofs,' such as trial by ordeal, could no longer be seen as consistent with justice or with how truth determinations ought to be made."[3] Some rational standard was needed by which to gauge the certainty of a defendant's guilt. At first, no witnesses were presented to the jury because, as neighbors of the defendant, jurors were expected to already be familiar with the facts.[4] Thus, the verdict was based on the jurors' own knowledge. However, by the end of the fourteenth century witnesses were permitted to testify, though they were neither a formal nor essential part of the trial.[5] When, at the close of the sixteenth century, jurors began to rely less upon their personal knowledge of the events, and more upon the testimony of witnesses, it became essential that some standard of proof be formulated to guarantee a verdict based upon reason.

Theologians and philosophers of that era recognized that "knowledge" ranges from absolute certainty to mere probability. Within this continuum there are three categories of knowledge: (1) "mathematical knowledge" or truth deduced by logical demonstration from known principles; (2) "physical knowledge" or truth gained directly and immediately via the senses; and (3) "moral knowledge" or truth based on testimony or secondhand reports of another person's sensory data.[6] For rationalists like René Descartes, truth could be positively ascertained by means of mathematical knowledge. For empiricists like John Locke, physical knowledge was paramount. Both sides agreed, however, that the least

---

2. The trial court instructed the jury in pertinent part:

> Now if you find from the evidence *beyond a reasonable doubt* that on or about the 23rd day of May, 1995 in Brazoria County, Texas, the defendant, PAUL DAVID PAULSON, did unlawfully appropriate, by acquisition and be [sic] exercising control over, property other than real property, namely a barbeque pit, owned by Sam Thomas, without the effective consent of Sam Thomas, the owner, with intent to deprive the said owner of said property permanently, and that the value of such property was then and there five hundred dollars ($500.00) or over and under the value of fifteen hundred dollars ($1,500.00), then you will find the defendant guilty of theft as charged in the information.
>
> Unless you so find *beyond a reasonable doubt,* or if you have a *reasonable doubt* thereof, you will acquit the defendant.

(Emphasis added).

3. Barbara J. Shapiro, Beyond Reasonable Doubt and Probable Cause 3 (1991). " 'Irrational proofs' were replaced on the Continent by the Romano-canon inquisitional process, and in England by the jury trial." *Id.*

4. *Id.* at 4.

5. *Id.*

6. *Id.* at 7–8.

certain category of knowledge was "moral knowledge." Unfortunately, this was also the form of knowledge most relevant to resolving factual issues in the courtroom. Thus, proof in the courtroom could never rise higher than to a "moral certainty," and because "moral knowledge" was more akin to "probability" than true knowledge, proof to a "moral certainty" did not equate with absolute certainty, but "required only that one have no reasonable doubts about one's beliefs."[7]

The concept was expressed in various forms. Toward the end of the seventeenth century the phrases which predominate include: "if you believe," "if you are satisfied or not satisfied with the evidence," and "satisfied conscience." This is not to say that the "satisfied conscience" test altered or replaced the "moral certainty" standard. In fact, there does not appear to be any meaningful distinction between "moral certainty" and "satisfied conscience" because the phrases were used interchangeably.[8] However, by the beginning of the eighteenth century, the concept was commonly expressed in terms of "satisfied conscience."[9]

The terms "moral certainty" and "satisfied conscience," in turn, began to give way to "reasonable doubt" in the second half the eighteenth century.[10] There is a dispute among scholars as to why the new terminology was increasingly favored, but in application it was considered no different than "moral certainty" or "satisfied conscience" for these terms were all explicitly linked by their common substitution for one another.[11] The earliest recorded use of "reasonable doubt" in American ju-

**7.** Anthony A. Morano, *A Reexamination of the Development of the Reasonable Doubt Rule*, 55 B.U. L. Rev. 507, 513 (1975). *See also* Shapiro, *supra* note 3, at 8 (citing John Wilkins, *Of the Principles and Duties of Natural Religion* 7–8 (London, 1675) and Walter Charleton, *Immortality of the Human Soul* 186–88 (London 1657)):

> Although moral certainties did not depend on evidence that compelled assent, they might be so clear that everyone "whose judgment is free from prejudice will consent to them. And though there be no natural necessity, that things be so, and they cannot possibly be otherwise ... yet may they be so certain as not to admit of any *reasonable doubt* concerning them." Moral certainty could thus "be styled" indubitable. The "reasonable man" will not require demonstration or proofs that "exclude all Dubiosity, and compel assent," but will accept moral and physical proofs that are the best that may be gained. One could thus gain a "competent certitude where demonstration is impossible."

The word "moral" does not, in this context, relate to ethics, but refers to an opinion "based upon inner conviction" or one that is "virtual rather than actual, immediate, or completely demonstrable." *See* Webster's Third New International Dictionary 1468 (1993).

**8.** *See* Shapiro, *supra* note 3, at 13.

**9.** *Id.* To be "guided by one's conscience" does not, in a secular society, possess the same degree of solemnity it once enjoyed. Citing William Perkins, *Discourse of Conscience* (1596), Shapiro writes:

> According to Perkins, the conscience that was given by God to man "to declare or put in execution his just judgment against sinners" was "part of the Understanding in all reasonable creatures," and its function was to judge the goodness or badness of things or actions done and to "accuse or excuse." ... Conscience functioned as "a little God sitting in the middle of men's hearts, arraigning them in this life as they shall be arraigned for the offenses" at the day of judgment. Perkins [wrote]: "... the courts of man and their authority are under conscience." For God had "erected a tribunal seat" in man, and "conscience itself" was therefore the "highest judge that is or can be under God."

*Id.* at 15.

**10.** In 1752, the prosecution in an English case suggested the evidence was "so strong, so convincing, ... that that Presumption that will rise to a Conviction; there will not remain the least Doubt of it." *Id.* at 21.

**11.** *Id.* at 25. Professor Morano suggests that the term "reasonable doubt" was introduced by prosecutors who were attempting to escape the burden of proving their cases beyond all doubt. *See* Morano, *supra* note 7, at 508. Shapiro, however, contends:

> Reasonable doubt was simply a better explanation of the satisfied conscience standard that resulted from increasing familiar-

risprudence appears to have been in the trials following the Boston Massacre in 1770. The prosecution argued that the jury would be forced to acquit the defendants only if the "Evidence is not sufficient to Convince [you] beyond a reasonable Doubt" of their guilt.[12] John Adams, who defended the soldiers, argued for an acquittal if the jurors possessed *any* doubt:

> [T]he best rule in doubtful cases, is, rather to incline to acquittal than conviction: and ... [w]here you are doubtful never act; that is, if you doubt of the prisoner's guilt, never declare him guilty; this is always the rule, expecially [sic] in cases of life.[13]

The judges of the court employed the "fully satisfied" and "satisfied belief" standards, but also added: "If upon the whole, ye are in reasonable doubt of their guilt, we [ye?] must then, agreeable to the rule of law, declare them innocent." [14]

### Adoption of the "Reasonable Doubt" Standard

Despite its early use in American jurisprudence, the phrase "reasonable doubt" appears in neither our federal nor state constitutions. However, its use by trial courts was common and the standard was expressly approved by various appellate courts during the nineteenth and twentieth centuries.[15] In 1970, the United States Supreme Court, after reciting numerous references to the reasonable doubt standard in federal jurisprudence and its almost universal acceptance in common-law jurisdictions, declared: "[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

In Texas, the "reasonable doubt" and "satisfied conscience" standards appear to have been used simultaneously until 1925. The 1879, 1895, and 1911 penal codes utilized the "satisfied conscience" test, while the 1879 and 1895 codes of criminal procedure used the "reasonable doubt" test.[16] The statutes seem to have been harmonized by combining both tests into one charge. *See Guest v. State,* 24 Tex.App. 235, 5 S.W. 840, 842 (1887) ("In order to convict the defendant of the crime of theft, you must be satisfied from the evidence, beyond a reasonable doubt, that he ....").

### Defining "Reasonable Doubt"

Like "moral certainty" and "satisfied conscience," "proof beyond a reasonable

---

ity with the moral certainty concept. The emphasis on doubt almost certainly owes something to the growing participation of defense counsel in criminal cases. It would obviously be in the interest of defendants to emphasize doubt.
Shapiro, *supra* note 3, at 21–22.

**12.** *See* Shapiro, *supra* note 3, at 22.

**13.** Morano, *supra* note 7, at 517.

**14.** Shapiro, *supra* note 3, at 22 (citing *The Legal Papers of John Adams,* ed. L. Wroth and H. Zobel, 3 vols. (Cambridge, Mass., 1965)).

**15.** The time of appellate endorsement and acceptance of the reasonable doubt standard varied considerably from one state to another. Compare: North Carolina (1828); New York (1839); Vermont (1840); Massachusetts (1841); Georgia (1849); Virginia (1855); Connecticut (1870); Pennsylvania (1905); and Maryland (1949). *See* Morano, *supra* note 7, at 520–23.

**16.** *See, e.g.,* Tex. Penal Code Art. 11 (1879) (repealed) ("Every person accused of an offense shall be presumed to be innocent until his guilt is established to the satisfaction of those whose province it is to try him."). The same language is repeated in Tex. Penal Code Art. 11 (1895) (repealed) and Tex. Penal Code Art. 11 (1911). Article 727 of the 1879 Code of Criminal Procedure and Article 765 of 1895 code provided: "The defendant in a criminal case is presumed to be innocent until his guilt is established by legal evidence; and in case of reasonable doubt as to his guilt he is entitled to be acquitted." In 1925, similar language was added to the penal code: "Every person accused of an offense shall be presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt." Tex. Penal Code Art. 9 (1925) (repealed).

doubt" explained and defined the degree of certitude required for a criminal conviction. The phrase gained popularity and replaced the former terms precisely because this definition of the concept was so easily understood. Inevitably, however, some courts attempted to "define the definition." Because the concept of "reasonable doubt" is more easily understood than explained, attempts at defining the term frequently ended in failure. *See Buel v. State,* 104 Wis. 132, 80 N.W. 78, 85 (1899). Moreover, while it is the duty of every trial judge to convey legal doctrines to jurors with absolute clarity, cogent reasons exist to suggest the term should not be further defined.

■ First, there is no constitutional imperative that "reasonable doubt" be defined. *See Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In fact, a trial court may properly refuse to define the term even in the face of a jury's request to do so. *See United States v. Reives,* 15 F.3d 42, 46 (4th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994).

Second, attempts to explain the term do not usually result in making it any clearer to the minds of the jury. *See Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In fact, definitions tend to impermissibly lessen the burden of proof. *See United States v. Adkins,* 937 F.2d 947, 950 (4th Cir.1991). Moreover, any attempt to define the term requires use of additional terms which themselves require definition. *See United States v. Langer,* 962 F.2d 592, 600 (7th Cir.1992).

Third, while courts may attempt to define the term, if they fail to adequately explain the concept, the error constitutes "structural error" necessitating a reversal of the conviction without regard to harm. *See Sullivan v. Louisiana,* 508 U.S. 275, 281–82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Thus, "any use of an instruction defining reasonable doubt presents a situation equivalent to playing with fire." *Langer,* 962 F.2d at 600. Accordingly, attempts at defining "reasonable doubt" have been explicitly discouraged by some courts.[17]

Considering the minimal benefits, as contrasted with the potentially grave consequences of defining "reasonable doubt," the District of Columbia Circuit concluded that the greatest wisdom suggests it is best to let the jury decide the meaning of "reasonable doubt." *See United States v. Taylor,* 997 F.2d 1551, 1558 (D.C.Cir.1993). Certainly, this was the course followed in Texas until recently.

Before *Geesa* it was well-established that "the language of the statute on reasonable doubt needs no amplification or attempt on the part of the trial court to explain the term." *Whitson v. State,* 495 S.W.2d 944, 946 (Tex.Crim.App.1973). Because "reasonable doubt" has a "commonly accepted meaning and [is] well understood by everyone," trial courts were not encouraged to submit any definition for the term. *Gallegos v. State,* 152 Tex.Crim. 508, 512, 215 S.W.2d 344, 346 (1948). *See also Marquez v. State,* 725 S.W.2d 217, 241 (Tex. Crim.App.1987) (citing numerous authorities); *Pierce v. State,* 159 Tex.Crim. 504, 505, 265 S.W.2d 601, 602 (1954); *Marshall v. State,* 76 Tex.Crim. 386, 387, 175 S.W. 154, 155 (1915); *Abram v. State,* 36 Tex. Crim. 44, 45, 35 S.W. 389, 390 (1896) ("It is not proper for the court to discuss what the reasonable doubt is. The jury is as competent to determine that as the court.").

17. *See Lackey v. Scott,* 28 F.3d 486, 491 (5th Cir.1994), *cert. denied,* 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); *United States v. Martin–Trigona,* 684 F.2d 485, 493 (7th Cir.1982). Interestingly, "reasonable doubt" remains undefined in England, and any attempt to define "reasonable doubt" in Australia constitutes error. *See* Thomas V. Mulrine, *Reasonable Doubt: How in the World is it Defined?,* 12 AM. U.J. INT'L L. & POL'Y 195, 218 (1997).

Notwithstanding the aforementioned admonitions and extensive precedent, the Court of Criminal Appeals constructed a definition of "reasonable doubt" in *Geesa. See Geesa*, 820 S.W.2d at 162. The definition is, we believe, consistent with the historical meaning of the term. Moreover, we have no doubt that it is as clear and concise a definition of the concept as may be humanly constructed. If a trial court is inclined to give a definition of "reasonable doubt," the one provided in *Geesa* is certainly an excellent model. However, the Court of Criminal Appeals did not offer the instruction as an "approved" or " recommended" definition, but a mandatory charge that "shall be submitted to the jury in all criminal cases, even in the absence of an objection or request by the State or the defendant, whether the evidence be circumstantial or direct." *Id.* It is the mandatory nature of this instruction with its accompanying penalty of "automatic reversible error" which we find so perplexing.[18]

### *Mandatory Requirement*

When the Court of Criminal Appeals adopted its reasonable doubt instruction in *Geesa*, it predicated its action upon the fact that it had, earlier in the opinion, abolished the "reasonable hypothesis" analytical construct for assessing the probity of circumstantial evidence on appeal. Thus, the compulsory nature of the reasonable doubt charge is, to some extent, linked to the pervasive notion that circumstantial evidence is inferior to direct evidence. The court apparently believed that without the protection of a definitional charge on reasonable doubt, jurors might draw less than reasonable inferences from circumstantial evidence, and thus find a defendant guilty without the requisite degree of certitude required by constitutional principles of due process.

The historic distrust of circumstantial evidence arose not from its lack of probative force, but from certain irrebuttable presumptions which arose in early common law. For example, Lord Coke observed:

If a man that is innocent be accused of felony, and for fear flieth from the same, albeit he judicially acquitteth himselfe of the felonie, yet if it be found that he fled for the felonie, he shall, notwithstanding his innocencie, forfeit all his goods and chattels, debts and duties; for as to the forfeiture of them, the law will admit no proofe against the presumption in law grounded upon his flight: and so in many other cases.

2 Sir Edward Coke, Institutes of the Laws of England 373b (18th ed., London, 1823). These presumptions were exceedingly harsh, leading on some occasions to the imprisonment or execution of innocent men. Blackstone warns:

. . . all presumptive evidence of felony should be admitted cautiously: for the law holds, that it is better that ten guilty persons escape, than that one innocent suffer. And sir Matthew Hale in particular lays down two rules, most prudent and necessary to be observed: 1. Never to convict a man for stealing the goods of a person unknown, merely because he will give no account how he came by them, unless an actual felony be proved of such goods: and, 2. Never to convict any person of murder or manslaughter, till at least the body be found dead; on account of two instances he mentions, where persons were executed for the murder of others, who were then alive, but missing.

4 William Blackstone, Commentaries on the Laws of England 352 (Oxford, Clarendon 1769).

It came gradually to be realized, however, that the problem was with the presumptions, not any inherent weakness of circumstantial evidence. In fact, early in

---

18. Although a proper definition is always appropriate, "the decision whether to define reasonable doubt should be left to the court's discretion." *United States v. Nolasco*, 926 F.2d 869, 872 (9th Cir.), *cert. denied*, 502 U.S. 833, 112 S.Ct. 111, 116 L.Ed.2d 80 (1991).

Texas jurisprudence, Justice Caruthers was forced to admit that circumstantial evidence can, in some circumstances, supercede the probative force of direct testimony:

> I do not yield unqualified assent to the proposition, as a rule of law, that circumstantial evidence is never to be weighed against positive testimony. There may be cases, and there are cases every day occurring, where the testimony of a witness testifying positively to an asserted fact as transpiring within his view, and honestly testifying, too, is disproved and falsified by proof of facts and circumstances known to exist, and the existence of which is wholly incompatible with the fact deposed to. In such cases, circumstantial evidence outweighs positive testimony. . . . The saying often qoted [sic], but with most perverse application, both in ordinary conversation and in argument at the bar, "that circumstances never lie, but that a witness may," is, when stated with legal precision, a truth.

*Coles' Adm'rs v. Perry,* 7 Tex. 109, 168 (1851). *See also Law v. State,* 33 Tex. 37, 38 (1870) ("Circumstantial evidence is often as strong and as conclusive upon the understanding as direct and positive evidence.") Nevertheless, an irrational distrust of circumstantial evidence lingered in the jurisprudence of this and many other states.[19]

To protect the accused from the perceived weaknesses of circumstantial evidence, the trial court was required to submit an instruction to the jury in all cases where the State relied upon such evidence. *See Galvan v. State,* 598 S.W.2d 624, 627–28 (Tex.Crim.App.1979); *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App.1977). Pursuant to this "circumstantial evidence charge," jurors were instructed to acquit the defendant if the evidence did not exclude every reasonable hypothesis other than guilt.[20]

---

19. 1A WIGMORE, EVIDENCE § 26 (Tillers rev. 1983), at 961, provides an anecdotal confirmation of the historical prejudice against circumstantial evidence:

> [In the early days of trial courts in Indiana] the following case of circumstantial evidence [was presented]. It happened in Judge Eggleston's court, presided over, however, by the associates. The case was for five dollars damages for killing a dog. The plaintiff testified that he saw the defendant pick up his rifle, run across a lot, rest it on a fence, saw a flash, heard the report, saw the dog fall, went up to him, and saw the bullet hole just behind his front leg. The evidence seemed conclusive. All appeared lost, but the defendant's attorney was not disconcerted. He knew the associates had just been reading a new law book, Phillip's Evidence, which cautioned judges against the pitfalls of circumstantial evidence. He therefore recalled the witness, had him repeat his evidence and ended by asking him if he saw the bullet hit the dog. When the witness refused to testify to the fact, the lawyer casually observed to the court, "A case of mere circumstantial evidence," and rested his case. After due deliberation, the court announced, "This is a plain case of circumstantial evidence, judgment for the defendant."

[Citing *Courts and Lawyers of Indiana* (Esarey & Shockley eds.1916)].

20. The standard instruction provided:

> You are instructed that in this case the state relies on circumstantial evidence for a conviction.
>
> In order to warrant a conviction of a crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence, beyond a reasonable doubt; all the facts (that is, the facts necessary to the conclusion) must be consistent with each other and, taken together, must be of a conclusive nature, leading on the whole to a satisfactory conclusion and producing, in effect, a reasonable and moral certainty that the accused, and no other person, committed the offense charged.
>
> But in such cases it is not sufficient that the circumstances coincide with, account for, and therefore render probable the guilt of the defendant. They must exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt; and unless they do so, beyond a reasonable doubt, you will find the defendant not guilty.

STATE BAR OF TEXAS, TEXAS CRIMINAL PATTERN JURY CHARGES (1975), at 3.

Distrust of circumstantial evidence slowly dissipated during the twentieth century. Following the modern trend, the Court of Criminal Appeals announced in 1983 that "direct and circumstantial evidence are equally probative," and it abandoned the circumstantial evidence charge. *See Hankins v. State*, 646 S.W.2d 191, 199 (Tex. Crim.App.1981). The court concluded that the constitutionally required burden of proof in criminal cases is that "the State establish all elements of the offense beyond a reasonable doubt." *Id.* Rather than aiding jurors in applying the reasonable doubt standard, the court held that an additional charge on circumstantial evidence focusing on the "reasonable hypothesis" theory served only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations. *Id.* However, while the court abolished the distinction between direct and circumstantial evidence at trial, it curiously retained the "reasonable hypothesis" analytical construct when assessing the sufficiency of circumstantial evidence on appeal. *See Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Crim.App.1983).[21]

In *Geesa*, the Court of Criminal Appeals attempted to finally dispose of the last distinction between direct and circumstantial evidence—it abandoned the "reasonable hypothesis" analytical construct as a standard for appellate review. *See Geesa*, 820 S.W.2d at 161. This action was linked, however, to the fact that it was also formulating a mandatory, definitional instruction on "reasonable doubt." *Id.* The court deemed this necessary because "it is evident that [two decisions of the United States Supreme Court, i.e., *Holland v. United States* and *Jackson v. Virginia* ] implicated the requirement of a full definitional instruction to the jury on reasonable doubt." *Id.* We have difficulty recognizing such an implication in either case.

In *Holland*, the Supreme Court repudiated the need of a circumstantial evidence charge, holding "the better rule is that where the jury *is properly instructed on the standards for reasonable doubt*, such an additional instruction on circumstantial evidence is confusing and incorrect." *Holland*, 348 U.S. at 139–40, 75 S.Ct. 127 (emphasis added). The trial court defined "reasonable doubt" in *Holland* and from this fact it might be mistakenly presumed that a "proper" instruction on "reasonable doubt" is one that *defines* the term. However, the Supreme Court was critical of the definition given by the trial court and observed that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." *Id.* at 140, 75 S.Ct. 127. Thus, *Holland* merely stands for the proposition that the "reasonable doubt" standard serves equally well in cases based upon direct or circumstantial evidence. Rather, than suggesting that "reasonable doubt" must be explained or defined for the jury, the Supreme Court expressly cautioned against such practice.

In *Jackson v. Virginia*, 443 U.S. 307, 315–18, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court explained its understanding of "reasonable doubt" and observed that the concept is the constitutional standard for assessing sufficiency of the evidence. However, we find nothing in the opinion which suggests the trial court must define "reasonable doubt" for the jury.

We do not question that a well-worded definition of "reasonable doubt," like the one set forth in *Geesa*, may assist some jurors in their understanding of the concept. It is possible, for example, that "reasonable doubt" does not have the same meaning it enjoyed at the beginning of this century.[22] Perhaps, like "moral certainty"

---

21. *Carlsen* was subsequently overruled by *Geesa*, 820 S.W.2d at 158.

22. Epistemology does not hold the same degree of fascination with today's existentialist society as it did with former generations. By the end of the eighteenth century, for example, the terms "moral certainty," "satisfied conscience," and "reasonable doubt" were

and "satisfied conscience," we are in transition from "reasonable doubt" to some more descriptive, but as yet unarticulated, standard. At least one judge has argued that a definition of "reasonable doubt" is needed to counter an increasingly illiterate jury pool.[23] Certainly, a majority of jurisdictions now offer or permit some definition of "reasonable doubt."[24] While the reasons for this trend are not entirely clear, one thing is certain, the trend is not propelled by some constitutional necessity. Accordingly, we see no logical reason to forego a harmless error analysis.

### Harmless Error

■ Ordinarily, when a trial court makes an error in the court's charge, we will not reverse the trial court's judgment unless the defendant demonstrates from the record that the error was calculated to injure his rights or prevented him from receiving a fair trial. *See* Tex.Code Crim. Proc. Ann. art. 36.19 (Vernon 1981). When the defendant fails to object to the jury charge, we will not reverse the judgment unless the harm flowing from the given charge is so egregious as to deny the

defendant a fair and impartial trial. *See Almanza v. State*, 686 S.W.2d 157, 173 (Tex.Crim.App.1984).[25]

■ Moreover, except for certain federal constitutional errors labeled by the United States Supreme Court as "structural," no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune from a harmless error analysis. *See Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997). Structural errors include total deprivation of counsel, a biased judge, the unlawful exclusion of the members of the defendant's race from the jury, the right to self-representation, and the right to a public trial. *See Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Here, as we have already observed, no definition of "reasonable doubt" is constitutionally required. Thus, it would seem appellant must show from the record that the error actually harmed him. *See* Art. 36.19; *Atkinson v. State*, 923 S.W.2d 21, 26 (Tex. Crim.App.1996); *Arline v. State*, 721 S.W.2d 348 (Tex.Crim.App.1986).

well-understood and used in many disciplines. Shapiro writes:

> This terminology, however, foreign sounding to modern ears, was part of the language and discourse of the educated classes in both England and America. Satisfied conscience, reasonable doubt, and moral certainty were widely used concepts, and these and related terms were found in moral, theological, historical, philosophical, and legal discourse.

Shapiro, *supra* note 3, at 25.

**23.** Judge Fortunato observed:

> [A]t a time when social planners and commentators are concerned with declining literacy and the depreciation of critical reasoning skills with the general population, forces within the legislative and legal systems—ostensibly motivated by goals of inclusion and increased diversity—are expanding jury pools from those individuals who have expended the effort and time to place their name on the voting roles to those who have simply been able to muster that minimal amount of energy required to obtain a driver's license. Bluntly, the educated and the uneducated, the voracious

reader and the functionally illiterate, the citizen activist and the shirker, are all called upon to serve on juries, and the role of the trial judge is to address the spectrum with clarity.

Stephen J. Fortunato, Jr., *Instructing on Reasonable Doubt After Victor v. Nebraska: A Trial Judge's Certain Thoughts on Certainty*, 41 Vill. L. Rev. 365, 425–26 (1996).

**24.** Timothy P. O'Neill, *Instructing Illinois Juries on the Definition of "Reasonable Doubt": The Need for Reform*, 27 Loy. U. Chi. L.J. 921, 930–39 (1996).

**25.** In *Rose v. State*, 752 S.W.2d 529, 553–54 (Tex.Crim.App.1987), the Court held that the *Almanza* standard has been supplanted by the Rules of Appellate Procedure. *See also Rodriguez v. State*, 758 S.W.2d 787, 788 (Tex.Crim. App.1988); Tex.R.App. P. 44.2. The Court of Criminal Appeals, however, has continued to cite *Almanza* with approval. *See, e.g., Reich–Bacot v. State*, 976 S.W.2d 678 (1998); *Posey v. State*, 966 S.W.2d 57, 59–60 (Tex.Crim.App. 1998); *Skinner v. State*, 956 S.W.2d 532, 544 (Tex.Crim.App.1997).

The error appears in all respects harmless. First, the trial court's reliance on "reasonable doubt" without further amplification is logically and legally defensible.[26] "Language that is within the comprehension of persons of ordinary intelligence can seldom be made plainer by further defining or refining." *Buel*, 80 N.W. at 85. Second, juries in this state have comprehended the term for well over a hundred years with no additional instructions. It seems unlikely that they should abruptly lose their understanding of the concept. Third, the jury did not request a definition of reasonable doubt and there is nothing in the record to show the term was misunderstood. Were we free to conduct a harm analysis, we would have no difficulty doing so. The Court of Criminal appeals foreclosed this possibility last year when it held that the omission of the definitional instruction on reasonable doubt, as mandated by *Geesa*, "defies meaningful analysis by harmless error standards." *See State v. Toney*, 979 S.W.2d 642, 644 (Tex. Crim.App.1998).

As an intermediate appellate court we must defer to the decisions of the Court of Criminal Appeals. Accordingly, we reluctantly sustain appellant's first point of error.

## RIGHT TO COUNSEL

In his second point of error, appellant contends he was denied his right to counsel under the Sixth Amendment of the federal constitution and Article I § 10 of the state constitution. He also argues the record does not show that he knowingly waived his right to counsel.

The State filed the complaint and information on August 28, 1995. The trial court noted on its docket that on January 5, 1996, the cause was reset to allow appellant time to employ an attorney and that the cause was scheduled for trial on March 18, 1996. The docket entry on March 18, 1996, shows the cause to have been reset until May 13, 1996. On May 16, 1996, the docket sheet reflects the court heard several pro se motions presented by appellant. The record, however, does not reflect whether the court admonished appellant of the dangers of self-representation.

Appellant eventually hired an attorney, and he was represented by counsel during his trial. He contends, however, that he was denied counsel during the aforementioned hearing on his pro se motions. Among these motions were four requests to dismiss the cause of action, two requests for notice of extraneous offenses, a request for information, a request for a pre-trial hearing, a request for a continuance, a request to have the jury consider probation, a request to have the jury assess punishment, and a request for certain jury

---

26. Professor Wigmore writes:

From time to time, various efforts have been made to define more in detail this elusive and undefinable state of mind.... Nevertheless, when anything more than a simple caution and a brief definition is given, the matter tends to become one of mere words, and the actual effect upon the jury, instead of being enlightenment, is likely to be rather confusion, or, at the least, a continued incomprehension. In practice, these detailed amplifications of the doctrine have usually degenerated into a mere tool for counsel who desire to entrap an unwary judge into forgetfulness of some obscure precedent, or to save a cause for a new trial by quibbling, on appeal, over the verbal propriety of a form of words uttered or declined to be uttered by the judge. The effort to perpetuate and develop these elaborate unserviceable definitions is a useless one, and serves today chiefly to aid the purposes of the tactician. It should be abandoned.

. . .

The truth is that no one has yet invented or discovered a mode of measurement for the intensity of human belief. Hence there can be yet no successful method of communicating intelligibly to a jury a sound method of self-analysis for one's belief. If this truth be appreciated, courts will cease to treat any particular form of words as necessary or decisive in the law for that purpose; for the law cannot expect to do what logic and psychology have not yet done.

9 WIGMORE, EVIDENCE § 2497, at 405–15 (Chadvourn rev.1981).

instructions. Appellant claims he made admissions in these motions that he would not have otherwise made if he had been represented by counsel.

The record does not support appellant's assertion that he was denied counsel. He did not argue below, and does not argue here, that he is indigent and thus entitled to appointed counsel. Indeed, he was able to make a $5,000 surety bond and succeeded in hiring counsel to represent him at trial. Rather, he seems to argue that before representing himself pro se, the trial court was obliged to warn him of the hazards of self-representation. *See Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Johnson v. State,* 760 S.W.2d 277, 279 (Tex.Crim.App. 1988).

■ We agree the trial judge should have warned appellant of the dangers of self-representation. However, under the facts presented here, we find the error to be harmless beyond a reasonable doubt. *See* Tex.R.App. P. 44.2. Appellant contends he was harmed by admissions he made in his *written* motions. While a trial court may refuse to hear pro se motions, it cannot prevent a defendant from filing them with the clerk. By the time the trial court conducted a hearing on these motions, the alleged damage had already been done. Any admonitions given to appellant at the time of the hearing would not have prevented the State from examining appellant's motions, ascertaining his defensive theory, and deducing his version of the facts. Accordingly, appellant's second point of error is overruled.

Appellant's motion for rehearing is granted and his first point of error is sustained. We therefore reverse the judgment of the trial court and remand the cause for a new trial.

Chief Justice MURPHY concurs in the result only.